# UTAH DIVISION OF STATE LANDS *v.*
# UNITED STATES ET AL.

No. 85–1772.   Argued March 23, 1987—Decided June 8, 1987

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BLACKMUN, POWELL, and SCALIA, JJ., joined. WHITE, J., filed a dissenting opinion, in which BRENNAN, MARSHALL, and STEVENS, JJ., joined, *post,* p. 209.

*Dallin W. Jensen,* Solicitor General of Utah, argued the cause for petitioner. With him on the briefs were *David L. Wilkinson,* Attorney General, and *Michael M. Quealy* and *R. Douglas Credille,* Assistant Attorneys General.

*Edwin S. Kneedler* argued the cause for respondents. With him on the brief were *Solicitor General Fried, Assistant Attorney General Habicht, Deputy Solicitor General Wallace, Jacques B. Gelin,* and *Dirk D. Snel.**

JUSTICE O'CONNOR delivered the opinion of the Court.

The issue in this case is whether title to the bed of Utah Lake passed to the State of Utah under the equal footing doctrine upon Utah's admission to the Union in 1896.

I

A

The equal footing doctrine is deeply rooted in history, and the proper application of the doctrine requires an understanding of its origins. Under English common law the English Crown held sovereign title to all lands underlying navigable waters. Because title to such land was important to the sovereign's ability to control navigation, fishing, and other commercial activity on rivers and lakes, ownership of this land was considered an essential attribute of sovereignty.

---

*A brief of *amici curiae* urging reversal was filed for the State of Alaska et al. by *Ronald W. Lorensen,* Acting Attorney General of Alaska, and *G. Thomas Koester,* Assistant Attorney General, and by the Attorneys General for their respective jurisdictions as follows: *Charles A. Graddick* of Alabama, *Robert K. Corbin* of Arizona, *John Steven Clark* of Arkansas, *John Van de Kamp* of California, *Duane Woodard* of Colorado, *Jim Smith* of Florida, *Michael J. Bowers* of Georgia, *Corinne K. A. Watanabe* of Hawaii, *Jim Jones* of Idaho, *Neil F. Hartigan* of Illinois, *Linley E. Pearson* of Indiana, *Thomas J. Miller* of Iowa, *Robert T. Stephan* of Kansas, *William J. Guste, Jr.,* of Louisiana, *Francis X. Bellotti* of Massachusetts, *Frank J. Kelley* of Michigan, *Edwin Lloyd Pittman* of Mississippi, *William L. Webster* of Missouri, *Mike Greely* of Montana, *Robert M. Spire* of Nebraska, *Brian McKay* of Nevada, *Stephen E. Merrill* of New Hampshire, *Paul Bardacke* of New Mexico, *Lacy H. Thornburg* of North Carolina, *Nicholas J. Spaeth* of North Dakota, *Michael C. Turpen* of Oklahoma, *Dave Frohnmayer* of Oregon, *Jim Mattox* of Texas, *Ken Eikenberry* of Washington, *Charles G. Brown* of West Virginia, *Bronson C. La Follette* of Wisconsin, and *Archie G. McClintock* of Wyoming.

Title to such land was therefore vested in the sovereign for the benefit of the whole people. See *Shively* v. *Bowlby*, 152 U. S. 1, 11–14 (1894). When the 13 Colonies became independent from Great Britain, they claimed title to the lands under navigable waters within their boundaries as the sovereign successors to the English Crown. *Id.*, at 15. Because all subsequently admitted States enter the Union on an "equal footing" with the original 13 States, they too hold title to the land under navigable waters within their boundaries upon entry into the Union. *Pollard's Lessee* v. *Hagan*, 3 How. 212 (1845).

In *Pollard's Lessee* this Court announced the principle that the United States held the lands under navigable waters in the Territories "in trust" for the future States that would be created, and in dicta even suggested that the equal footing doctrine absolutely prohibited the United States from taking any steps to defeat the passing of title to land underneath navigable waters to the States. *Id.*, at 230. Half a century later, however, the Court disavowed the dicta in *Pollard's Lessee*, and held that the Federal Government had the power, under the Property Clause, to convey such land to third parties:

> "By the Constitution, as is now well settled, the United States, having rightfully acquired the Territories, and being the only government which can impose laws upon them, have the entire dominion and sovereignty, national and municipal, Federal and state, over all the Territories, so long as they remain in territorial condition. . . .
>
> "We cannot doubt, therefore, that Congress has the power to make grants of lands below high water mark of navigable waters in any Territory of the United States, whenever it becomes necessary to do so in order to perform international obligations, or to effect the improvement of such lands for the promotion and convenience of commerce with foreign nations and among the several

States, or to carry out other public purposes appropriate to the objects for which the United States hold the Territory." *Shively* v. *Bowlby*, 152 U. S., at 48.

Thus, under the Constitution, the Federal Government could defeat a prospective State's title to land under navigable waters by a prestatehood conveyance of the land to a private party for a public purpose appropriate to the Territory. The Court further noted, however, that Congress had never undertaken by general land laws to dispose of land under navigable waters. *Ibid.* From this, the Court inferred a congressional policy (although not a constitutional obligation) to grant away land under navigable waters *only* "in case of some international duty or public exigency." *Id.*, at 50.

The principles articulated in *Shively* have been applied a number of times by this Court, and in each case we have consistently acknowledged congressional policy to dispose of sovereign lands only in the most unusual circumstances. In recognition of this policy, we do not lightly infer a congressional intent to defeat a State's title to land under navigable waters:

> "[T]he United States early adopted and constantly has adhered to the policy of regarding lands under navigable waters in acquired territory, while under its sole dominion, as held for the ultimate benefit of future States, and so has refrained from making any disposal thereof, save in exceptional instances when impelled to particular disposals by some international duty or public exigency. It follows from this that disposals by the United States during the territorial period are not lightly to be inferred, and should not be regarded as intended unless the intention was definitely declared or otherwise made very plain." *United States* v. *Holt State Bank*, 270 U. S. 49, 55 (1926).

We have stated that "[a] court deciding a question of title to the bed of a navigable water must . . . begin with a strong presumption against conveyance by the United States, and

must not infer such a conveyance unless the intention was definitely declared or otherwise made very plain, or was rendered in clear and especial words, or unless the claim confirmed in terms embraces the land under the waters of the stream." *Montana* v. *United States*, 450 U. S. 544, 552 (1981) (internal quotations omitted; citations omitted). Indeed, in only a single case—*Choctaw Nation* v. *Oklahoma*, 397 U. S. 620 (1970)—have we concluded that Congress intended to grant sovereign lands to a private party. The holding in *Choctaw Nation*, moreover, rested on the unusual history behind the Indian treaties at issue in that case, and indispensable to the holding was a promise to the Indian Tribe that no part of the reservation would become part of a State. *Montana* v. *United States*, *supra*, at 555, n. 5. *Choctaw Nation* was thus literally a "singular exception," in which the result depended "on very peculiar circumstances." 450 U. S., at 555, n. 5.

## B

Utah Lake is a navigable body of freshwater covering 150 square miles. It is drained by the Jordan River, which flows northward and empties into the Great Salt Lake. Several years before the entry of Utah into the Union, "[t]he opening of the arid lands to homesteading raised the specter that settlers might claim lands more suitable for reservoir sites or other irrigation works, impeding future reclamation efforts." *California* v. *United States*, 438 U. S. 645, 659 (1978). In response, Congress passed the Sundry Appropriations Act of 1888, 25 Stat. 505 (1888 Act), which authorized the United States Geological Survey to select "sites for reservoirs and other hydraulic works necessary for the storage and utilization of water for irrigation and the prevention of floods and overflows." *Id.*, at 526. The Act further provided that the United States would reserve the sites that might be so selected:

"[A]ll the lands which may hereafter be designated or selected . . . for sites for reservoirs, ditches or canals for

irrigation purposes and all the lands made susceptible of irrigation by such reservoirs, ditches or canals are from this time henceforth hereby reserved from sale as the property of the United States, and shall not be subject after the passage of this act, to entry, settlement or occupation until further provided by law." *Id.*, at 527.

On April 6, 1889, Major John Wesley Powell, the Director of the United States Geological Survey, submitted a report to the Secretary of the Interior stating that the "site of Utah Lake in Utah County in the Territory of Utah is hereby selected as a reservoir site, together with all lands situate within two statute miles of the border of said lake at high water." App. 19. The Commissioner of the General Land Office subsequently informed the Land Office at Salt Lake City of the selection of "the site of Utah Lake" as "a reservoir site" and instructed the Land Office "to refuse further entries or filing on the lands designated, in accordance with the [Sundry Appropriations] Act of October 2, 1888." Letter of Apr. 11, 1889, App. 21. The selection of Utah Lake as a reservoir was confirmed in the official reports of the Geological Survey to Congress.

Because the 1888 Act reserved all the land that "may" be designated, the 1888 Act had the practical effect of reserving all of the public lands in the West from public settlement. *California* v. *United States*, 438 U. S., at 659. Therefore, in 1890—in response to "a perfect storm of indignation from the people of the West," *ibid.* (quoting 29 Cong. Rec. 1955 (1897) (statement of Cong. McRae))—Congress repealed the 1888 Act in the Sundry Appropriations Act of 1890, ch. 837, 26 Stat. 371 (1890 Act). In repealing the 1888 Act, however, Congress provided "that reservoir sites heretofore located or selected shall remain segregated and reserved from entry or settlement as provided by [the 1888 Act]." *Id.*, at 391. Six years later, on January 4, 1896, Utah entered the Union. The Utah Enabling Act of July 16, 1894, provided that Utah

was "to be admitted into the Union on an equal footing with the original States." 28 Stat. 107.

In 1976, the Bureau of Land Management of the United States Department of the Interior issued oil and gas leases for lands underlying Utah Lake. Viewing this as a violation of its ownership and property rights to the bed of Utah Lake, the State of Utah brought suit in the District Court for the District of Utah seeking a declaratory judgment that it, rather than the United States, had title to the lakebed. Utah also sought an injunction against interference with its alleged ownership and management rights. In its complaint, Utah claimed that on January 4, 1896, by virtue of the State's admission into the Union on an equal footing with all other States, the State of Utah became the owner of the bed of Utah Lake. The United States, in turn, answered that title to the lakebed remained in federal ownership by operation of Major Powell's selection of the lake as a reservoir site in 1889. The District Court granted summary judgment for the United States, holding that the United States held title to the bed of Utah Lake. 624 F. Supp. 622 (1983). The District Court found that the withdrawal of the bed of Utah Lake in 1889 pursuant to the 1888 Act defeated Utah's claim to title under the equal footing doctrine. The Court of Appeals for the Tenth Circuit affirmed. 780 F. 2d 1515 (1985). We granted certiorari, 479 U. S. 881 (1986), and now reverse.

II

The State of Utah contends that only a conveyance to a third party, and not merely a federal reservation of land, can defeat a State's title to land under navigable waters upon entry into the Union. Although this Court has always spoken in terms of a "conveyance" by the United States before statehood, we have never decided whether Congress may defeat a State's claim to title by a federal reservation or withdrawal of land under navigable waters. In *Shively*, this Court concluded that the only *constitutional* limitation on the

right to grant sovereign land is that such a grant must be for a "public purpos[e] appropriate to the objects for which the United States hold[s] the Territory." 152 U. S., at 48. In the Court's view, the power to make such a grant arose out of the Federal Government's power over Territories under the Property Clause of the United States Constitution, which provides:

> "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States . . . ." U. S. Const., Art. IV, § 3, cl. 2.

The Property Clause grants Congress plenary power to regulate and dispose of land within the Territories, and assuredly Congress also has the power to acquire land in aid of other powers conferred on it by the Constitution. Under Utah's view, however, while the United States could create a reservoir site by granting title to Utah Lake to a private entity, the United States could not accomplish the same purpose by a means that would keep Utah Lake under federal control. We need not decide that question today, however, because even if a reservation of the bed of Utah Lake could defeat Utah's claim, it was not accomplished on these facts.

Although arguably there is nothing in the Constitution to prevent the Federal Government from defeating a State's title to land under navigable waters by its own reservation for a particular use, the strong presumption is against finding an intent to defeat the State's title. In *Shively* and *Holt State Bank* this Court observed that Congress "early adopted and constantly has adhered" to a policy of holding land under navigable waters "for the ultimate benefit of future States." *United States* v. *Holt State Bank*, 270 U. S., at 55; *Shively* v. *Bowlby*, 152 U. S., at 49–50. Congress, therefore, will defeat a future State's entitlement to land under navigable waters only "in exceptional instances," and in light of this policy, whether faced with a reservation or a conveyance, we simply cannot infer that Congress intended to defeat a future State's

title to land under navigable waters "unless the intention was definitely declared or otherwise made very plain." *United States* v. *Holt State Bank, supra,* at 55.

When Congress intends to convey land under navigable waters to a private party, of necessity it must also intend to defeat the future State's claim to the land. When Congress reserves land for a particular purpose, however, it may not also intend to defeat a future State's title to the land. The land remains in federal control, and therefore may still be held for the ultimate benefit of future States. Moreover, even if the land under navigable water passes to the State, the Federal Government may still control, develop, and use the waters for its own purposes. *Arizona* v. *California,* 373 U. S. 546, 597–598 (1963). Congress, for example, may intend to create a reservoir, but also intend to let the State obtain title to the land underneath this reservoir upon entry into statehood. Such an intent would not be unusual. In *Montana* v. *United States,* 450 U. S. 544 (1981), we found that Congress intended to permit the State to take title to the bed of a navigable river even though the river was in the midst of an Indian Reservation, and in *United States* v. *Holt State Bank, supra,* we held that Congress intended the State to hold title to the bed of a navigable lake wholly within the boundaries of an Indian Reservation.

Given the longstanding policy of holding land under navigable waters for the ultimate benefit of the States, therefore, we would not infer an intent to defeat a State's equal footing entitlement from the mere act of reservation itself. Assuming, *arguendo,* that a reservation of land could be effective to overcome the strong presumption against the defeat of state title, the United States would not merely be required to establish that Congress clearly intended to include land under navigable waters within the federal reservation; the United States would additionally have to establish that Congress affirmatively intended to defeat the future State's title to such land.

## III

We conclude that the 1888 Act fails to make sufficiently plain either a congressional intent to include the bed of Utah Lake within the reservation or an intent to defeat Utah's claim to title under the equal footing doctrine.   The 1888 Act provided that the reserved lands were "reserved from sale as the property of the United States, and shall not be subject . . . to entry, settlement or occupation until further provided by law."   25 Stat. 527.   The words of the 1888 Act did not necessarily refer to lands under navigable waters because lands under navigable lakes and rivers such as the bed of Utah Lake were *already* the property of the United States, and were *already* exempt from sale, entry, settlement, or occupation under the general land laws.   As this Court recognized in *Shively* v. *Bowlby, supra,* at 48, "Congress has never undertaken by general laws to dispose of" land under navigable waters.   See also *Mann* v. *Tacoma Land Co.,* 153 U. S. 273, 284 (1894) (applying *Shively* v. *Bowlby, supra,* to hold that "the general legislation of Congress in respect to public lands does not extend to tide lands"); *Illinois Central R. Co.* v. *Illinois,* 146 U. S. 387, 437 (1892) (holding that "the same doctrine as to the dominion and sovereignty over and ownership of lands under the navigable waters . . . applies, which obtains at the common law as to the dominion and sovereignty over and ownership of lands under tide waters on the borders of the sea").   Therefore, little purpose would have been served by the reservation of the bed of Utah Lake. Moreover, the concerns with monopolization and speculation that motivated Congress to enact the 1888 Act, see P. Gates, History of Public Land Law Development 641 (1968), had nothing to do with the beds of navigable rivers and lakes.

The intent to reach only land that would otherwise be available for sale and settlement is made manifest by the Act's proviso:

> "*Provided,* That the President may at any time in his discretion by proclamation open any portion or all of the

lands reserved by this provision to settlement under the homestead laws." 25 Stat. 527.

This proviso would permit the President to open *any* land reserved under the 1888 Act to settlement under the homesteading laws. We find it inconceivable that Congress intended by this simple proviso to abandon its long-held and unyielding policy of never permitting the sale or settlement of land under navigable waters under the general land laws. *Shively* v. *Bowlby,* 152 U. S., at 48. The proviso can be interpreted consistently with that policy only if lands under navigable waters were not subject to reservation under the 1888 Act in the first instance.

The United States, however, does not rely solely on the 1888 Act. It points to references to the bed of Utah Lake made by the Geological Survey in reserving Utah Lake, and contends that Congress ratified the Geological Survey's reservation of the bed of Utah Lake in the 1890 Act. In the 1890 Act, Congress repealed the 1888 Act, but also specifically provided that "reservoir sites heretofore located or selected shall remain segregated and reserved from entry or settlement as provided by [the 1888] Act, until otherwise provided by law." 26 Stat. 391. Thus, the United States argues, Congress ratified the reservation of the lakebed of Utah Lake.

At first examination, statements made by the Geological Survey in reserving Utah Lake might seem to support this argument. The Tenth Annual Report of the Geological Survey (1890), which was transmitted to Congress, stated that an individual had been sent to examine Utah Lake "with reference to its capacity for a reservoir site," in order that he might "furnish the specifications for its withdrawal as such under the law, so far as the lands covered or overflowed by it or the lands bordering upon it were still public lands." App. 25. Furthermore, in the Eleventh Annual Report (1891), the Geological Survey reported that "the segregation" of

Utah Lake "was made to include not only the bed but the lowlands up to mean high water." App. 29. The Geological Survey's references to the "segregation" of the bed of Utah Lake, however, must be placed in the proper context. A "segregation" of land simply means that the land is no longer subject to disposal under the public land laws. See E. Baynard, Public Land Law and Procedure § 5.32, p. 174 (1986). The bed of Utah Lake had *already* been "segregated" by the United States Geological Survey even before the adoption of the 1888 Act. The United States had surveyed Utah Lake between 1856 and 1878, and had established the "meander line"—the mean high-water elevation—segregating the land covered by navigable waters from land available for public sale and settlement.* 4 Record, Doc. F; U. S. Bureau of Land Management, Manual of Instructions for Survey of Public Lands of the United States § 3–115, p. 93 (1973) ("All navigable bodies of water and other important rivers and lakes are segregated from the public lands at

---

*The dissent misconstrues our argument with regard to the segregation of Utah Lake between 1856 and 1878. *Post*, at 214, n. 5. Our point is *not* that the meander line was a "boundary" between the lands under the navigable waters and the adjacent lands granted by the Federal Government to private citizens, nor that this line settled the property rights of those who occupied exposed land within the meander line when Utah Lake receded. The resolution of these issues is complex, depending in large measure on the facts of the specific survey. See 4 Record, Doc. J, p. 27 (Department of Interior Memorandum discussing the effect of the exposure of land contained within the meander line to Utah Lake on land patents granted before 1888); *Poynter* v. *Chipman*, 8 Utah 442, 32 P. 690 (1893) (case involving title to land between meander line and shoreline of Utah Lake); *Knudsen* v. *Omanson*, 10 Utah 124, 37 P. 250 (1894) (same); *Hinckley* v. *Peay*, 22 Utah 21, 60 P. 1012 (1900) (same). We express no opinion on these matters. Instead, our point is a simpler one—that the meander line "segregated" the bed of Utah Lake from public sale even before the 1889 reservation, and, accordingly, that the references to the "segregation" of the lakebed by the United States Geological Survey cannot be taken as unambiguous statements of an intent to include the lakebed within the 1889 reservation.

mean high-water elevation"). Given that the bed of Utah Lake was already "segregated" from public sale, the United States Geological Survey Reports are best understood as reporting the *further* segregation of the lands *adjacent* to the lake which, until the reservation of Utah Lake in 1889, had not been segregated and thus had been available for public settlement. In the Eleventh Annual Report, for example, the Geological Survey's announcement that "the segregation" of Utah Lake "includ[ed] not only the bed but the lowlands up to mean high water" in our view simply announced an *increase* in the segregated portion of Utah Lake. App. 29. Because the bed of Utah Lake had been segregated as early as 1878, the Geological Survey's statement that the lakebed was segregated need not be taken as a statement that the bed was included within the reservation. Similarly, the Tenth Annual Report's statement that a Geological Survey employee would furnish specifications for a withdrawal "so far as the lands covered or overflowed by [Utah Lake] or the lands bordering upon it *were still public lands*," *id.*, at 25 (emphasis supplied), is consistent with an intention that the Geological Survey would withdraw those lands *still* subject to public settlement, *i. e.*, the lands that were "still public lands." See Baynard, *supra*, § 1.1, p. 2 ("Most enduringly, the *public lands* have been defined as those lands subject to sale or other disposal under the general land laws") (emphasis in original). Because the bed of Utah Lake was not at that time "public land" subject to settlement, we think it doubtful that the Tenth Annual Report should be understood as informing Congress that the Geological Survey had reserved the bed of Utah Lake.

The record reflects that the Geological Survey's concern in 1889 was not with the bed of Utah Lake; rather its concern was that the land adjacent to the lake was then available for public sale and settlement under the general land laws. In Major Powell's letter to the Department of the Interior announcing the selection of Utah Lake as a reservoir site he did

not discuss the bed of Utah Lake. Instead, he observed that "further entries of the lands adjoining Utah Lake will have a tendency to defeat the purposes of [the 1888 Act] and obstruct the use of the lake as a natural reservoir," App. 20, and that "speedy action" was necessary to avoid settlement. *Ibid.* Thus, Major Powell recommended that "the Register of the Land Office at Salt Lake City be instructed to refuse entries of public land within" two miles of the lake. *Ibid.* The local land office was so instructed by the Department of the Interior. *Id.*, at 21.

We further find no clear demonstration that Congress intended to ratify any reservation of the bed of Utah Lake in the 1890 Act. At best, the United States points to only scattered references to the bed of Utah Lake in the material submitted to Congress, and presents no unambiguous evidence that Members of Congress actually understood these references as pointing to a reservation of the bed of Utah Lake. As with the 1888 Act, the language of the 1890 Act is consistent with the view that only land available for entry and sale was reserved:

> "[R]eservoir sites heretofore located or selected shall remain segregated and reserved from entry or settlement as provided by said act, until otherwise provided by law . . . ." 26 Stat. 391.

In sum, the 1890 Act can be understood as ratifying a reservation of the bed of Utah Lake only by ignoring the language of the 1890 Act and by taking the Geological Survey's references to the bed of Utah Lake out of context. Under our precedents, however, we cannot so lightly infer the reservation of land under navigable waters. We conclude, therefore, that the 1890 Act no more "'definitely declared or otherwise made very plain'" Congress' intention to reserve Utah Lake than had the 1888 Act. *Montana* v. *United States*, 450 U. S., at 552 (quoting *United States* v. *Holt State Bank*, 270 U. S., at 55).

## IV

Even if Congress did intend to reserve the bed of Utah Lake in either the 1888 Act or the 1890 Act, however, Congress did not clearly express an intention to defeat Utah's claim to the lakebed under the equal footing doctrine upon entry into statehood. The United States points to no evidence of a congressional intent to defeat Utah's entitlement to the bed of Utah Lake, and the structure and the history of the 1888 Act strongly suggest that Congress had no such intention. On its face, the 1888 Act does not purport to defeat the entitlement of future States to any land reserved. Instead, the Act merely provides that any reserved land is "reserved from sale" and "shall not be subject . . . to entry, settlement or occupation"; it makes no mention of the States' entitlement to the beds of navigable rivers and lakes upon entry into statehood. The transfer of title of the bed of Utah Lake to Utah, moreover, would not necessarily prevent the Federal Government from subsequently developing a reservoir or water reclamation project at the lake in any event. See, *e. g.*, *Arizona* v. *California*, 283 U. S. 423, 451–452, 457 (1931) (holding that the United States has power to construct a dam and reservoir on a navigable river and reserving question of such power for purpose of irrigating public lands).

Finally, the broad sweep of the 1888 Act cannot be reconciled with an intent to defeat the States' title to the land under navigable waters. As noted above, the 1888 Act "had the practical effect of reserving all of the public lands in the West from settlement." *California* v. *United States*, 438 U. S., at 659. In light of the congressional policy of defeating the future States' title to the lands under navigable waters only "in exceptional instances" in case of "international duty or public exigency," *United States* v. *Holt State Bank*, *supra*, at 55, we find it inconceivable that Congress intended to defeat the future States' title to *all* such land in the western United States. Such an action would be wholly at odds

with Congress' policy of holding this land for the ultimate benefit of the future States.

In sum, Congress did not definitely declare or otherwise make very plain either its intention to reserve the bed of Utah Lake or to defeat Utah's title to the bed under the equal footing doctrine. Accordingly, we hold that the bed of Utah Lake passed to Utah upon that State's entry into statehood on January 4, 1896. The judgment of the Court of Appeals is

*Reversed.*

JUSTICE WHITE, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE STEVENS join, dissenting.

A State obtains title to the land underlying a navigable water upon its admission to the Union unless Congress' intention to convey the land to a third party during the territorial period "was definitely declared or otherwise made very plain, or was rendered in clear and especial words, or unless the claim confirmed in terms embraces the land under the waters of the stream." *Montana* v. *United States*, 450 U. S. 544, 552 (1981) (internal quotations omitted; citations omitted). In this case we are presented with the question whether a congressional reservation of land unto the United States during the territorial period has defeated a State's claim to title under the equal footing doctrine. Contrary to the Court's opinion and judgment today, I am confident that Congress has the power to prevent ownership of land underlying a navigable water from passing to a new State by reserving the land to itself for an appropriate public purpose and that Congress plainly and specifically expressed its intent to exercise that power with respect to Utah Lake in the Sundry Appropriations Act of Aug. 30, 1890, 26 Stat. 371, 390–392 (1890 Act).

The Property Clause of the Constitution, Art. IV, § 3, cl. 2, is the source of the congressional power. See *ante*, at 200–201. In *Shively* v. *Bowlby*, 152 U. S. 1, 48 (1894), the Court stated:

"We cannot doubt . . . that Congress has the power to make grants of lands below high water mark of navigable waters in any Territory of the United States, whenever it becomes necessary to do so in order to perform international obligations, or to effect the improvement of such lands for the promotion and convenience of commerce with foreign nations and among the several States, *or to carry out other public purposes appropriate to the objects for which the United States hold the Territory.*" (Emphasis added.)

The development of reservoirs for irrigation in the arid West is surely an appropriate public purpose, and there is no reason to distinguish between a conveyance to a third party required for that purpose and a reservation unto the United States for the same purpose. Contrary to petitioner's position, were I to make a distinction, I would more readily find a reservation constitutionally permissible than a conveyance. In the case of a reservation, the submerged lands retain their sovereign status. See *ante,* at 195–196. And if Congress later determines that the lands are no longer needed by the Federal Government for a public purpose, it can at that time transfer title to the State.

Pursuant to the Sundry Appropriations Act of Oct. 2, 1888, 25 Stat. 505, 526–527 (1888 Act), Major John Wesley Powell, famed western explorer, scientist, and Director of the United States Geological Survey (USGS), set out to identify reservoir sites.[1] By letter of April 6, 1889, he reported to the

---

[1] Major Powell was quite familiar with the 1888 Act, having been for many years the leading proponent of a federal policy for reclamation of the arid West and essentially the only authority in the Federal Government on the science of irrigation. See W. Darrah, Powell of the Colorado 299–314 (1951). In 1878, he submitted to Congress his Report on the Lands of the Arid Region of the United States, with a More Detailed Account of the Lands of Utah, H. R. Exec. Doc. No. 73, 45th Cong., 2d Sess. (1878), a seminal work in the evolution of federal reclamation policy. See P. Gates, History of Public Land Law Development 645 (1968). In 1888, Major Powell reported to the Senate, at its request, 19 Cong. Rec. 2428–2429

Secretary of the Interior that "the site of Utah Lake in Utah County in the Territory of Utah is hereby selected as a reservoir site, together with all lands situate within two statute miles of the border of said lake at high water." *Ante*, at 199; App. 19.[2]   The selection of Utah Lake as a reservoir site was thereafter confirmed in the official reports of the USGS, which were formally transmitted to Congress as required by the 1888 Act.[3]   In the Tenth Annual Report of USGS to Secretary of the Interior 1888–1889, Part II—Irrigation, for the fiscal year ending June 30, 1889, Major Powell stated: "In April, Mr. Newell was sent to Utah to make certain examinations of Utah Lake with reference to its capacity for a reser-

(1888), on the appropriation that would be required to "investigate the practicability of constructing reservoirs for the storage of water in the arid region of the United States," the designation of sites for such reservoirs and related works, and the segregation of lands susceptible to irrigation. In the report, which was submitted to the Senate on May 11, 1888, Powell proposed language for an appropriations bill which was incorporated, with two changes not pertinent here, into the 1888 Act.   See Tenth Annual Report of USGS to Secretary of the Interior 1888–1889, Part II—Irrigation, H. R. Exec. Doc. No. 1, 51st Cong., 1st Sess., pt. 5, pp. 8–14 (1890).

[2] The majority makes much of the fact that Major Powell "did not discuss the bed of Utah Lake" in his 1889 letter to the Secretary of the Interior.   *Ante*, at 206–207.   It is true that the word "bed" is not found in the brief letter, but the land underlying the lake is clearly denoted by the words "the site of Utah Lake."   Major Powell selected as a reservoir site "the site of Utah Lake . . . *together with* all lands situate within two statute miles of the border of said lake at high water."   (Emphasis added.)   Although it may have been the impending settlement of lands adjoining the lake which necessitated expeditious action, nothing in the letter suggested that the bed of the lake was forever unnecessary to the purpose of the reservation.

[3] The 1888 Act provided that "the Director of the Geological Survey under the supervision of the Secretary of the Interior shall make a report to Congress on the first Monday in December of each year, showing in detail how the [money appropriated for the selection of sites for reservoirs] has been expended, the amount used for actual survey and engineer work in the field in locating sites for reservoires *[sic]* and an itemized account of the expenditures under this appropriation."   25 Stat. 526–527.

voir site and to furnish the specifications for its withdrawal as such under the law, *so far as the lands covered or overflowed by it* or the lands bordering upon it were still public lands." *Id.*, at 88; App. 25 (emphasis added). It is difficult to imagine a clearer statement to Congress of the reservation of the bed of Utah Lake.[4] Major Powell, the director of the agency charged with implementing the 1888 Act, unquestionably understood the Act to authorize the reservation of lands underlying navigable waters. His contemporaneous construction of the Act is entitled to considerable deference. *Udall* v. *Tallman*, 380 U. S. 1, 16 (1965). The argument advanced by the majority in support of its position that the 1888 Act does not authorize the reservation of a lakebed, *ante*, at 203–204, is singularly unpersuasive as a basis for rejecting the USGS's interpretation.

Moreover, Congress clearly ratified the reservation of Utah Lake, including its bed, in the 1890 Act. Any concerns about the scope of the 1888 Act are put to rest by this ratification. Although the 1890 Act repealed the withdrawal provision of the 1888 Act, see *ante*, at 199, Congress provided "that reservoir sites heretofore located or selected shall remain segregated and reserved from entry or settlement as provided by [the 1888] act, until otherwise provided by law, and reservoir sites hereafter located or selected on public

---

[4] The majority passes over the very clear, very specific reference to the bed of Utah Lake in the Tenth Annual Report and alights on the phrase "public lands." That phrase, according to the majority, means "lands subject to sale or other disposal under the general land laws." *Ante*, at 206. This interpretive approach is inconsistent with our recent opinion in *Amoco Production Co.* v. *Gambell*, 480 U. S. 531, 549, n. 15 (1987), where we "reject[ed] the assertion that the phrase 'public lands,' in and of itself, has a precise meaning, without reference to a definitional section or its context in a statute." The most natural interpretation of "public lands" in this context is simply lands to which the Federal Government holds title. In *Choctaw Nation* v. *Oklahoma*, 397 U. S. 620, 633 (1970), for example, we stated that "the United States can dispose of lands underlying navigable waters just as it can dispose of *other public lands*." (Emphasis added.)

lands shall in like manner be reserved from the date of the location or selection thereof." 26 Stat. 391. The "broad sweep of the 1888 Act," *ante*, at 208, is therefore irrelevant since that Act was repealed before Utah was admitted to the Union. The pertinent statute, the 1890 Act, is more limited in scope, reserving to the United States only reservoir sites actually selected by the USGS.

Subsequent to the enactment of the 1890 Act, the Eleventh Annual Report of USGS to Secretary of the Interior 1889–1890, Part II—Irrigation, H. R. Exec. Doc. No. 1, 51st Cong., 2d Sess., pt. 5 (1890), for the fiscal year ending June 30, 1890, was transmitted to Congress. In that report, the USGS elaborated on its work at Utah Lake and described the reservation of the bed of the lake with unassailable clarity:

> "In Utah, in addition to the general reconnaissance of the storage facilities at the headwaters of the Sevier River and other streams, a careful survey was made of Utah Lake. This survey, run by level and transit around the lake, was for the purpose of determining the area which would be covered by damming or holding back the flood water. A description of the location and physical features of this body of water is to be found in this report under the head of Hydrography, and it will suffice to state here that after a careful study it was found that, on account of the excessive evaporation from such an enormous surface, the lake was too large to act in an economical manner as a storage reservoir. On the other hand, while it may not be advisable to hold back the water to a point above that of the average height, yet there is sufficient evidence to show that natural forces at times may raise the water level and increase the area to abnormal proportions by backing water over the great fringing marshes on the east and south. This land being, therefore, the natural flood ground of the lake, should be reserved up to the high-water line. Accordingly, *the segregation*, as shown on Pl. XCV and given in

the following lists, *was made to include not only the bed but the lowlands up to mean high water.*" *Id.,* at 183–184; App. 28–29 (emphasis added).

There followed a designation of the land included in the reservation by enumeration of sections, half-sections, and quarter-sections, concluding: "Total area segregated, 125,440 acres." *Id.,* at 184–189; App. 29–38. This area indisputably included the bed of the lake and Congress must have so understood it.[5]

---

[5] The majority's efforts to interpret the report otherwise, *ante,* at 204–207, are unpersuasive. Its conclusion that the bed of the lake up to mean high water had been "segregated" as of 1878 is based on the affidavit of a Bureau of Land Management official which states that "the original surveyed meander line on Utah Lake was completed by 1878, except for three small segments approximating a total of ten miles of shoreland . . . which was completed in 1910," 4 Record, Doc. F, and a 1973 Bureau of Land Management Manual which explains that that agency's current survey practice is to run a meander line at the mean high-water elevation. From these documents the majority appears to deduce the location of the 1878 meander line, its relationship to the area segregated by the USGS under the 1888 Act, and its legal significance with respect to the general land laws. None of these matters would have been apparent to the 51st Congress. Among other possible complexities ignored in this analysis is the fluctuating surface area of Utah Lake. The Manual on which the majority relies explains that "mean" high water is the annual mean:

"Practically all inland bodies of water pass through an annual cycle of changes, between the extremes of which will be found mean high water. . . . The most reliable indication of mean high-water elevation is the evidence made by the water's action at its various stages, which are generally well marked in the soil. . . .

"Mean high-water elevation is found at the margin of the area occupied by the water for the greater portion of each average year." U. S. Bureau of Land Management, Manual of Instructions for Survey of Public Lands of the United States § 3–116, pp. 94–95 (1973).

Mean high water, therefore, as defined in the Manual, does not account for variation from year to year. The Manual expressly states: "When by action of water the bed of the body of water changes, high-water mark changes, and the ownership of adjoining land progresses with it. *Lane* v. *United States,* 274 Fed. 290 (1921)." *Id.,* § 3–115, p. 94. The USGS reported in its Twelfth Annual Report, Part II–Irrigation, H. R. Exec. Doc. No. 1, 52d Cong., 1st Sess., pt. 5, p. 335 (1892), that the annual average

Several months after receiving the Eleventh Annual Report, Congress affirmed its intent to reserve the bed of Utah Lake for use as a reservoir. In the Act of Mar. 3, 1891, § 17,

---

level of Utah Lake varied greatly through the years, "the extreme range of water level since the settlement of the country being about 12 feet." Because the lake lies in a shallow basin, this fluctuation in water level results in substantial changes in surface area, "the shore advancing or retreating over a strip of land from 1 or 2 miles or even more in width." *Id.*, at 336. From 1884 to 1889, a drought period, the lake receded each year, exposing dry land to settlement. *Id.*, at 336–337. Nothing before Congress, however, clearly documented the relationship between the surface area of the lake in 1878, when the meander line was run, and 1889, when Utah Lake was segregated pursuant to the 1888 Act. The majority's assertion that the Eleventh Annual Report merely advised Congress of "the *further* segregation of the lands *adjacent* to the lake," *ante*, at 206, is based on the assumption that the 1878 meander line lay within the area of the 1889 reservation, but even if that assumption is correct, it would not have been apparent to Congress from the information before it. The legal significance of the 1878 meander line was also less than obvious. When the lake receded between 1884 and 1889 the newly exposed lands were settled, being "of great value to the people dwelling around the shores of the lake," since the arable and pasture lands of Utah County were fully utilized. Twelfth Annual Report, *supra*, at 336. This settlement was addressed at an August 19, 1889, hearing before the Senate Special Committee on Irrigation and Reclamation of Arid Lands. The Chairman of the Committee, Senator Stewart, engaged in the following exchange with the Water Master of Salt Lake City:

"Mr. Wilcken. . . . [T]hey have a dam at [Utah] Lake to store water. There has been a little contention with the people in Utah County. The lake has been going down rapidly since 1884; people have crowded upon the land, and the moment we commenced to store water, thereby causing the lake to rise, there was a cry.

"The Chairman. Within the last year there has been a reservation of any land needed for that purpose, and the Government will survey such land and set it apart; otherwise will there not be a disposition to crowd upon it and settle it up?

"Mr. Wilcken. Of course, some of the land has been entered; but whether they have perfected their titles or not I do not know." S. Rep. No. 928, 51st Cong., 1st Sess., pt. 3, p. 29 (1890).

The Court unfortunately rejects the plain and obvious meaning of the Eleventh Annual Report for a meaning fraught with uncertainty, and I would not assume that Congress did so. The United States has had no opportu-

26 Stat. 1101, Congress provided, *inter alia*, that reservoir sites selected or to be selected under the 1888 and 1890 Acts "shall be restricted to and shall contain only so much land as is actually necessary for the construction and maintenance of reservoirs." Although the 1891 legislation reflected congressional concern about the extent of reservoir site reservations, Congress declined to disturb the reserved status of the bed of Utah Lake. Similarly, in the Act of Feb. 26, 1897, 29 Stat. 599, 43 U. S. C. § 664, Congress provided that all reservoir sites reserved or to be reserved by the United States were to be open for the construction of reservoirs, canals, and ditches for irrigation under rules prescribed by the Secretary of the Interior but once again declined to disturb the 1888 Act reservations themselves.

The majority's skewed interpretation of the pertinent statutes and administrative reports appears to result from the unsupportable assumption that Congress could have had no reason to reserve the bed of the lake. The USGS informed Congress as early as 1889, prior to Congress' ratification of the reservation of Utah Lake in the 1890 Act, that when the lake was developed as a reservoir, the water level should be *lowered* beneath the natural shoreline in order to reduce its surface area and minimize the amount of water lost to evaporation. F. H. Newell of the USGS reported to the Senate Special Committee on the Irrigation and Reclamation of Arid Lands at an August 20, 1889, hearing on his examination of Utah Lake:

"At first it was thought necessary to raise the lake in order to get more water, but on more careful study I think the lake can perform its full functions best by

nity to brief the legal significance of the 1878 meander line, and, even though the majority disavows any intention of deciding property rights, *ante*, at 205, n., it would be most unfortunate if the majority's unsolicited conclusion with respect to the issue is inconsistent with that of the General Land Office and spawns litigation concerning otherwise established title to the lands bordering Utah Lake.

drawing down below the natural shore lines, rather than by raising it above them. In other words, if raised above, the lake will be too large for the evaporation area. The evaporation is even now too great in proportion to the amount of water than can be taken out." S. Rep. No. 928, 51st Cong., 1st Sess., pt. 3, p. 61 (1890).[6]

Congress could anticipate that if title to the bed of the lake passed to the State upon its admission to the Union and the United States thereafter developed a reservoir as proposed, state land would be exposed which the State presumably could develop or convey as it saw fit. This settlement would be incompatible with the Federal Government's use of the lake as a reservoir, however, because in times of flooding, water would be impounded in the reservoir, inundating the

---

[6] See also the Eleventh Annual Report. The Twelfth Annual Report for the fiscal year ending June 30, 1891, reiterated the USGS's position that the water level of Utah Lake should be lowered below the natural shoreline:

"[T]he lake is in effect too large to be most effective as a storage reservoir. . . . [T]he efficiency of the lake as a reservoir would be greatly increased if its area could be reduced even to less that [sic] half of its present extent; for by so doing in years of scarcity, as those of 1888 and 1889, a large proportion of the water which reaches the lake, instead of being lost by evaporation, would be retained and held for use in canals which cover the land of Salt Lake County. On the other hand, . . . if the lake were only one-half its present area, the floods which come in years of exceptional precipitation would cause a far greater proportional increase of water surface than now takes place, for this water, being thrown into a smaller lake and being able to escape but slowly through the Jordan River, would of necessity encroach upon a far greater proportion of the surrounding lands.

"Thus, while to obtain the maximum amount of water in years of scarcity it would be better if the lake were small, yet to take care of the floods, which will happen at intervals of from five to ten years, it is necessary that the lake have a flood area as large as it now has, or even what it would have at the highest water. From consideration of these points the segregation of the land around and under the lake was made to a contour line which should be 5 feet above the low-water mark of 1879." Id., at 339.

new settlements and potentially subjecting the Government to claims for compensation.

Moreover, Congress could anticipate that if the Federal Government did not retain title to the lakebed, it might be required to pay compensation for the use of nonfederal lands on which it constructed dams, dikes, or other works. The majority relies on *Arizona* v. *California*, 373 U. S. 546, 597–598 (1963), for the proposition that "even if the land under navigable water passes to the State, the Federal Government may still control, develop, and use the waters for its own purposes." *Ante*, at 202. But *Arizona* v. *California* concerned the issue of federal *water rights* in the Colorado River for use on Indian reservations, national forests, and recreational and wildlife areas, not the right to construct water control structures on state lands. Water rights are not at issue here. The majority also relies on an earlier opinion in *Arizona* v. *California*, 283 U. S. 423 (1931), for the proposition that "[t]he transfer of title of the bed of Utah Lake to Utah . . . would not necessarily prevent the federal government from subsequently developing a reservoir or water reclamation project at the lake in any event." *Ante*, at 208. We held in that case only that Congress had the power to construct a dam and reservoir, one purpose of which was expressly declared to be "improving navigation and regulating the flow of the river" pursuant to the Federal Government's navigational servitude. 283 U. S., at 455–456. We specifically reserved the question of the Federal Government's power to use state land for the construction of a project with other purposes: "Since the grant of authority to build the dam and reservoir is valid as an exercise of the Constitutional power to improve navigation, we have no occasion to decide whether the authority to construct the dam and reservoir might not also have been constitutionally conferred for the specified purpose of irrigating public lands of the United States." *Id.*, at 457. Because the Federal Government's right to construct irrigation works without the payment of

compensation is open to question, Congress may have intended to reserve the lakebed in order to avoid such claims. The majority's refusal to acknowledge such intent because it is not absolutely certain that the reservation was necessary to effectuate Congress' purpose is quite strange.

In sum, the reservation by the USGS of Utah Lake by its plain "terms embraces the land under the waters of the [lake]," and Congress "definitely declared" its intent to ratify that reservation in the 1890 Act. See *Montana* v. *United States*, 450 U. S., at 552. As I see it, Utah did not obtain title to the bed of the lake upon its admission to the Union, and I therefore dissent.