State of ALASKA, Plaintiff–Appellee,

v.

UNITED STATES of America,
Defendant–Appellant,

and

Arctic Slope Regional Corporation,
Intervenor–Appellant.

No. 98–35310.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 5, 1999

Filed May 23, 2000

Jared A. Goldstein, United States Department of Justice, Washington, D.C., for the defendant-appellant.

Joanne Grace, Assistant Attorney General, Anchorage, Alaska, for the plaintiff-appellee.

David C. Crosby, Wickwire, Greene, Crosby, Brewer & Seward, Juneau, Alaska, for the intervenor-appellant.

Before: CANBY, and GRABER, Circuit Judges, and GEORGE,[1] District Judge.

CANBY, Circuit Judge:

This appeal raises the question whether title to the bed of the Kukpowruk River in northern Alaska passed from the federal government to the State of Alaska when Alaska became a State in 1959. We conclude that it did not. A secondary question is whether the federal government's change in the status of the retained land after statehood caused title to the riverbed to pass to the State. Again, we conclude that it did not.

## FACTUAL BACKGROUND

The riverbed in issue lies within a tract of 48,800,000 acres that the federal government withdrew "from sale, location, selection, and entry" by Public Land Order 82 in 1943. Public Land Order 82, 8 Fed. Reg. 1599 (Feb 4, 1943) ("PLO 82"). The purpose of that withdrawal was to reserve minerals for use in the prosecution of World War II. See id. Encompassed within the tract withdrawn by PLO 82 was Naval Petroleum Reserve No. 4, which had been withdrawn in 1923 to provide oil and minerals for military purposes.[2] The Kukpowruk River lies within the portion of the PLO 82 tract that is outside of Naval Petroleum Reserve No. 4.

In 1958, one year before Alaska statehood, PLO 82 was modified to permit mining locations and mineral leasing on certain lands within its boundaries, including the Kukpowruk River. Portions of the PLO 82 tract were used for military purposes related to the Cold War, including long-range radio navigation, electronic and radar surveillance, and research into combat in polar regions. In 1960, one year after Alaska statehood, the Secretary of the Interior, acting on a proposal that preceded statehood, established and reserved the Arctic National Wildlife Refuge from PLO 82 lands. See PLO 2214, 25 Fed.Reg. 12,598–12,599 (Dec. 9, 1960). The Secretary then revoked PLO 82. See PLO 2215, 25 Fed.Reg. 12,599 (Dec. 9, 1960).

Thereafter, the United States conveyed substantial parts of the Kukpowruk River bed to the Arctic Slope Regional Corporation and the Cully Corporation, both Alaska Native corporations. Alaska challenged these conveyances by bringing this action to quiet title in federal district court, claiming that the Kukpowruk River was navigable and that the State acquired title to its bed upon statehood. The parties agreed to defer the issue of navigability. The district court then granted partial summary judgment to Alaska, holding that title to lands under navigable waters located within the PLO 82 tract passed to the State at statehood. Alternatively, the court held that, if title did not pass to Alaska upon statehood, then it did so nearly two years later when PLO 82 was revoked.

The district court certified these rulings for interlocutory appeal, and we accepted the certification.

## ANALYSIS

1. *Reservation at Statehood.*

■ As a general rule, the title to land lying beneath navigable waterways passes

---

1. The Honorable Lloyd D. George, Senior United States District Judge for the District of Nevada, sitting by designation.

2. After Alaska became a State, Naval Petroleum Reserve No. 4 was renamed the National Petroleum Reserve–Alaska. See 42 U.S.C. § 6502.

from the federal government to a State when the State is admitted to the Union "on an 'equal footing' with the original 13 States." *Utah Div. of State Lands v. United States*, 482 U.S. 193, 196, 107 S.Ct. 2318, 96 L.Ed.2d 162 (1987) ("*Utah Lake*"). This common-law rule was written into the Submerged Lands Act of 1953, 43 U.S.C. § 1311(a), but the Act, like the common-law doctrine, contained an exception for "all lands expressly retained by or ceded to the United States when the State entered the Union." 43 U.S.C. § 1313(a). The primary issue in dispute here is whether the bed of the Kukpowruk River was so "retained" by the federal government when Alaska became a State.

■ There is a strong presumption that lands beneath navigable waters are held by the United States in trust for future states. *See Utah Lake*, 482 U.S. at 197–98, 107 S.Ct. 2318. For a reservation by the United States to defeat the State's entitlement, two conditions would have to be met:

> [T]he United States would not merely be required to establish that Congress clearly intended to include land under navigable waters within the federal reservation; the United States would additionally have to establish that Congress affirmatively intended to defeat the future State's title to such land.

*Id.* at 202, 107 S.Ct. 2318.

■ As the district court in our case found, the United States clearly intended to include submerged lands when it withdrew "public lands" within PLO 82. The whole purpose of the withdrawal was to preserve oil and minerals for the war effort, and they lay largely under the submerged lands. The first condition of *Utah Lake* is thus met, and Alaska does not dispute that conclusion.

The district court held, however, that the second condition had not been met because the Alaska Statehood Act contained no clear expression that Congress

intended to defeat the State's presumed entitlement to land under navigable waters. We conclude that the district court erred in so ruling, and we are greatly aided in reaching that conclusion by a decision of the Supreme Court rendered after the district court entered its summary judgment: *United States v. Alaska*, 521 U.S. 1, 117 S.Ct. 1888, 138 L.Ed.2d 231 (1997) ("*Original 84*").[3] When PLO 82 is considered in conjunction with the Statehood Act and *Original 84*, it becomes apparent that the State cannot prevail.

The Alaska Statehood Act, Pub.L. 85–508, 72 Stat. 339, 48 U.S.C. ch.2 note, admitted Alaska into the Union in 1959. The United States argues that it retained title to submerged lands in PLO 82 under section 11(b) of that Act, which provides:

> Notwithstanding the admission of the State of Alaska into the Union, authority is reserved in the United States ... for the exercise by the Congress of the United States of the power of exclusive legislation, as provided by article I, section 8, clause 17 [the Enclave Clause] of the Constitution of the United States, in all cases whatsoever over such tracts or parcels of land as, immediately prior to the admission of said State, are owned by the United States and *held for military, naval, Air Force, or Coast Guard purposes,* including naval petroleum reserve numbered 4....

Statehood Act, § 11(b) (emphasis added).

The district court held that this reservation of the "power of exclusive legislation" did not reserve title unequivocally and defeat the entitlement of the State. *Original 84*, however, undermines that ruling. In *Original 84*, the Supreme Court construed the same language of section 11(b) of the Statehood Act and held that the title to submerged lands in the National Petroleum Reserve–Alaska (formerly Naval Petroleum Reserve No. 4) remained in the United States when Alaska became a

---

**3.** *Alaska* was brought directly in the Supreme Court under its original jurisdiction. We re-

fer to it by its docket number, Original 84, in order to prevent confusion of case names.

State. Crucial for present purposes is the Court's holding that:

> [W]hen the United States exercises its power of "exclusive legislation" under the Enclave Clause, it necessarily acquires title to the property....
>
> Section 11(b) thus reflects a clear congressional statement that the United States owned and would continue to own submerged lands included within the Reserve.

*Id.* at 42, 117 S.Ct. 1888. This ruling encompasses PLO 82 because the PLO tract was "held for military ... purposes" along with Naval Petroleum Reserve No. 4. Accordingly, the district court's ruling that section 11(b) fails to retain title unequivocally cannot stand.

Alaska presents several arguments to avoid the effect of *Original 84* and its construction of section 11(b). First, Alaska focuses on the proviso to section 11(b), which states in part:

> *Provided,* ... (iii) that such power of exclusive legislation shall rest and remain in the United States only so long as the particular tract or parcel of land involved is owned by the United States *and used* for military, naval, Air Force, or Coast Guard purposes.

Statehood Act, § 11(b)(iii) (emphases added). In Alaska's view, this proviso indicates that, when Congress in the main clause of section 11(b) reserved the right of exclusive legislation over land "held for military ... purposes," it actually intended by that phrase to reserve only land "used for military ... purposes." Alaska contends that, at the time of statehood, the PLO 82 tract outside of the Naval Petroleum Reserve was no longer used for military purposes.

■ There are several insurmountable difficulties with Alaska's argument. First, it renders meaningless Congress's choice of two different words, "held" and "used," in the same section of the Act. "We assume that Congress used two terms because it intended each term to have a particular, nonsuperfluous meaning." *Bailey v. United States,* 516 U.S. 137, 146, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995). The main clause of section 11(b) reserves all federal land "held" for military purposes. Alaska does not dispute that the PLO 82 lands were withdrawn for military purposes and that the withdrawal was not revoked until after statehood. We interpret a withdrawal order according to its original terms until it is formally withdrawn. *See United States v. Consolidated Mines & Smelting Co.,* 455 F.2d 432, 445 (9th Cir.1971). Accordingly, the PLO 82 tract was "held for military ... purposes," at the time of statehood, and accordingly was reserved to the United States under the main clause of section 11(b).[4]

■ Alaska contends that it makes no sense to give different meanings to "held" and "used" in section 11(b) and its proviso; the PLO 82 land "held" by the United States under its reservation would instantly be divested by the proviso because it was not "used" for military purposes. It is the exclusive power to legislate, however, that is lost by cessation of use under the proviso. It is true that, when the United States acquires under the Enclave Clause the exclusive power to legislate over land, it necessarily acquires title to that land. *Original 84,* 521 U.S. at 42, 117 S.Ct. 1888. But the converse does not follow: loss of the exclusive power to legislate does not necessarily include loss of title. *See Fort*

4. Similarly, section 6(e) of the Statehood Act transferred to Alaska land used for fisheries and wildlife conservation, but excepted "lands withdrawn or otherwise set apart as refuges or reservations." Statehood Act, § 6(e). The Supreme Court in *Original 84* held that this exception applied to lands of the Arctic National Wildlife Range, which was in the application stage at the time of statehood.

*See Original 84,* 521 U.S. at 55–61, 117 S.Ct. 1888. The Court held that the exception to 6(e) required only that the land be set aside for a refuge, not that this purpose be certain of accomplishment. *See id.* at 60, 117 S.Ct. 1888. The United States accordingly retained title to submerged lands within the Range. *See id.* at 61, 117 S.Ct. 1888.

*Leavenworth R.R. Co. v. Lowe,* 114 U.S. 525, 526–27, 5 S.Ct. 995, 29 L.Ed. 264 (1885) (United States retained rights as proprietor after losing exclusive jurisdiction over military reservation).

In any event, the lands in PLO 82 in fact were being used for military purposes at the time of statehood. Those uses included long-range radio navigation, electronic and radar surveillance, and research into polar combat. Alaska contends that those uses were confined to small parts of the PLO 82 tract, but Alaska has offered no authority to establish that parts of a military reservation lose their status when actual military operations do not take place on those parts.[5] It would not be an appropriate or judicially manageable exercise for the courts to attempt to adjudicate the status of reserved land on the basis of the situs of actual operations, or to override congressional or executive determinations of the appropriate size of a reservation for particular military uses. *See Benson v. United States,* 146 U.S. 325, 331, 13 S.Ct. 60, 36 L.Ed. 991 (1892) (character and purpose of military reservation established by responsible branch of government; courts are not to inquire regarding temporary uses). The United States accordingly did not lose its power of exclusive jurisdiction over the PLO 82 tract instantaneously upon statehood. The distinction in section 11(b) between lands "held" and "used" for military purposes has led to no absurd result.

Alaska next offers several additional arguments in support of its view that the PLO 82 tract was no longer held for military purposes at the time of statehood. First, Alaska contends that PLO 82 was not a withdrawal of lands for military purposes, but only a reservation of minerals for use in the war. *See* PLO 82, 8 Fed. Reg. 1599 (Feb. 4, 1943). But PLO 82 withdrew the land "from sale, location, selection, and entry." *Id.* PLO 82 was entitled "Withdrawing Public Lands for Use in Connection with the Prosecution of the War." The lands and the minerals were withdrawn and reserved in a piece. The most important lands, as in *Original 84,* were the submerged lands because that is where much of the oil and minerals were expected to be found. *See Original 84,* 521 U.S. at 45–46, 117 S.Ct. 1888. We therefore cannot accept Alaska's suggestion that the reservation was of oil alone.[6]

Alaska elaborates on this argument by contending that the purpose of the reservation of property held for military purposes in section 11(b) was to protect the right of military commanders to control their active military installations, not to insulate large reserves held for strategic purposes. The legislative history that Alaska offers in support of this proposition, however, relates to a very different situation in Hawaii.[7] Alaska further argues that the inclusion of Naval Petroleum Reserve No. 4 by name in section 11(b) indicates that such mineral reserves would not normally have fallen within the class of

---

5. Similarly, some parts of Naval Petroleum Reserve No. 4 were not being actively used for military purposes at the time of statehood, but that fact played no part in *Original 84.*

6. We note that the order reserving minerals in Naval Petroleum Reserve No. 4 was even more limited than that in PLO 82. It stated: "The reservation hereby established shall be for oil and gas only and shall not interfere with the use of the lands or waters within the area indicated for any legal purpose not inconsistent therewith." Executive Order 3797–A (Feb. 27, 1927) in Presidential Executive Orders (1980) (microfilm, reel 6). The inclusion of Naval Petroleum Reserve No. 4

within PLO 82 necessarily broadened this reservation, but not beyond the scope of the other lands reserved by PLO 82. If PLO 82 had been inadequate to reserve the submerged lands, then Alaska, rather than the United States, would have been entitled to the Naval Petroleum Reserve submerged lands in *Original 84.*

7. *See, e.g.,* Statehood for Hawaii: Hearings Before the Subcomm. on Territories and Insular Possessions of the Comm. on Interior and Insular Affairs on H.R. 21, H.R. 49, H.R. 205, H.R. 1745 and H.R. 2981, 83rd Cong. (1953).

property held for military purposes. Section 11(b), however, specifies a class of property held for military purposes *"including"* the Naval Petroleum Reserve. It would distort this statutory language to draw from it a conclusion that the Naval Petroleum Reserve was in a class of one, different from all other military reserves.

Alaska's next point is that the military purpose of the reservation ended when the PLO 82 lands outside of the Naval Petroleum Reserve were opened to private mineral exploration and leasing just prior to statehood. That opening, however, was not inconsistent with continued status of the tract as a military reservation. The lands were made available to mineral exploration and leasing (but not settlement) pursuant to 43 U.S.C. § 158, which was enacted in 1958. That statute contains a proviso that no exploration or disposition of minerals may take place if the Secretary of Defense "determines that such disposition or exploration is inconsistent with the military use of the lands so withdrawn or reserved." *Id.* That proviso indicates that mineral leasing is not an abandonment of the military purposes of the reservation; the reservation and its purposes remain in place, and leasing is deemed consistent with those purposes unless the Secretary determines otherwise.

We conclude, therefore, that none of Alaska's arguments succeeds in removing this case from the principles established in *Original 84.* The bed of the Kukpowruk River was reserved to the United States under section 11(b) of the Statehood Act, and did not pass to Alaska at the time of its statehood.

2. *Post–Statehood Revocation of PLO 82.*

■ Alaska's final contention, which was accepted in the alternative by the district court, is that title to the riverbed passed to

the State when PLO 82 was revoked in 1960. It is true that, under the proviso of section 11(b)(iii) of the Statehood Act, the United States loses exclusive legislative jurisdiction over the lands when they are no longer used for military purposes. Revocation presumably meets that test but, as we have already stated, loss of exclusive legislative jurisdiction does not cause loss of title. *See Fort Leavenworth R.R. Co.,* 114 U.S. at 526–27, 5 S.Ct. 995.[8]

Alaska next argues that, because the United States is presumed to hold the beds of navigable waters in trust for States to take title at statehood, it also must hold reserved lands *after* statehood in a similar trust. Consequently, the State argues, the title to the beds of navigable rivers within the reserved lands must pass to the state whenever, *after* statehood, the purpose that caused the lands to be reserved *at* statehood is no longer served. The State offers, and we have found, no authority for such a proposition. The key moment for the determination of title is the instant when statehood is created. The governing doctrine is that new States *"enter* the Union on an 'equal footing' with the original 13 States [and] hold title to the land under navigable waters within their boundaries *upon entry into the Union."* *Utah Lake,* 482 U.S. at 196, 107 S.Ct. 2318 (emphases added).

Alaska's contention also contradicts section 4 of the Statehood Act, which provides:

> the State and its people ... forever disclaim all right and title to any lands or other property not granted or confirmed to the State or its political subdivisions by or under the authority of this Act, the right or title

---

8. We note that, by the time the Supreme Court decided *Original 84,* the original purposes of Naval Petroleum Reserve No. 4 had changed substantially. It had been renamed the National Petroleum Reserve in Alaska and transferred to the jurisdiction of the Secretary

of the Interior, who could dispose of minerals for use by Alaska Natives and could convey surface estates to Alaska Native villages. *See* 42 U.S.C. § 6502. None of these changes had any effect on the decision in *Original 84.*

to which is held by the United States or is subject to disposition by the United States.

Statehood Act, § 4. For reasons already stated, the United States retained title to the bed of the Kukpowruk River at statehood. There is no authority permitting us to declare an automatic transfer in 1960 of that title from the United States to the State, in contravention of section 4 of the Statehood Act. We therefore reject Alaska's argument.

## CONCLUSION

The district court certified, and we accepted, two questions for decision:

(1) Whether Congress intended to defeat the passage of title to the State of Alaska on the date of statehood of submerged lands within Public Land Order 82.

We answer that question in the affirmative: Congress did intend to defeat the passage to Alaska of title to those lands.

(2) Assuming that Congress did intend to defeat the passage of title on the date of statehood, whether submerged lands within Public Land Order 82 which were not included in other withdrawal orders passed to the State of Alaska when Public Land Order 82 was revoked subsequent to Alaska statehood.

We answer that question in the negative: those submerged lands did not pass to Alaska when Public Land Order 82 was revoked.

Having answered the certified questions, we remand this matter to the district court for further proceedings consistent with this opinion and our answers.[9]

**9.** Our disposition of these two questions makes it unnecessary for us to address the arguments of the United States and the Intervenors that we should defer to the views of the Secretary on these questions. Two exhaustive opinions of Solicitors of the Department of the Interior had concluded that the United States retained title to submerged lands in PLO 82 at statehood, and that title

CERTIFIED QUESTIONS ANSWERED; REMANDED.

had not been lost by the subsequent revocation of PLO 82. *See* The Effect of Public Land Order 82 on the Ownership of Coastal Submerged Lands in Northern Alaska, 86 I.D. 151 (Dep't Int.1978); Ownership of Submerged lands in Northern Alaska in light of *Utah Division of State Lands v. United States,* 100 I.D. 103 (Dep't Int.1992).