713 F.2d 455
 The MUCKLESHOOT INDIAN TRIBE; Agatha Jerry Starr; Donald
Jerry; Lawrence Jerry; Bert Moses; Herman
Moses; Cecil Moses; and Howard Moses,
Plaintiffs- Appellees,
v.
TRANS-CANADA ENTERPRISES, LTD.; Synergy International,
Ltd.; and Herbert Guenther, Defendants-Appellants.
 No. 82-3439.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Jan. 4, 1983.
Decided Aug. 15, 1983.
 
 Richard Reich, Auburn, Wash., for plaintiffs-appellees.
 Robert E. Ratcliffe, Raymond L. Davis, Seattle, Wash., for defendants-appellants.
 Appeal from the United States District Court for the Western District of Washington.
 Before BROWNING, Chief Judge, and FLETCHER and PREGERSON, Circuit Judges.
 PER CURIAM:
 
 
 1
 This appeal involves a question of title to the former bed of the White River as it passes through the Muckleshoot Indian Reservation. The district court found that the United States had reserved the bed of the river for the use of the Tribe when the Government, by Executive Order, expanded the Muckleshoot Reservation in 1874. From this adverse judgment, appellants (Trans-Canada) appeal. This court's jurisdiction rests on 28 U.S.C. § 1291 (1976). We affirm the district court's carefully considered judgment.
 
 
 2
 * In December 1977, plaintiffs (Muckleshoot Tribe) filed suit in district court for declaratory judgment, quiet title, and ejectment, seeking to assert a claim to certain lands that were formerly the bed of the White River as it passed through the Muckleshoot Reservation.
 
 
 3
 The Muckleshoot Tribe comprises the descendants of Indians who once lived in villages along many of the Puget Sound rivers, including the White River. Ancestors of the Muckleshoot Tribe were parties to the Treaties of Medicine Creek and Point Elliott in 1854. See generally A. Josephy, Now That the Buffalo's Gone 181-85 (1982). These treaties ceded Indian land in Western Washington to the United States and reserved land for the exclusive use of the signatory tribes. In addition, the treaties secured to the tribes on- and off-reservation fishing rights. See Treaty of Medicine Creek, Dec. 26, 1854, 10 Stat. 1132; Treaty of Point Elliott, Jan. 22, 1855, 12 Stat. 927.
 
 
 4
 The original Muckleshoot Reservation had no direct access to any of the Tribe's traditional fishing streams, however. The Tribe was unhappy with this arrangement and repeatedly lodged protests with the Government between 1856 and 1874. In 1874, President Grant signed an Executive Order setting apart five alternate sections of land through which the White River flowed as an enlargement to the Muckleshoot Reservation.[1] The enlargement was a direct response to the Tribe's desire to have a traditional fishery within the reservation boundaries.
 
 
 5
 In 1874, the White River had a north and a south channel as it flowed through the reservation. The north channel was navigable, the south channel less clearly so. By 1915, the south channel was dry. Allotments riparian to the south channel made prior to 1915, however, included the bed of the south channel in the acreage assigned to individual Indian families. These conveyances were premised on the government surveyor's conclusion that the south channel was not navigable. Trans-Canada claims title to the bed of the former south channel as the successor in interest to the Indian allottees.
 
 
 6
 Below, the Tribe argued, and the district court found, that the south channel was indeed navigable at the time of the allotment survey. Consequently, title to the riverbed could not have been included in the original allotments. Moreover, the district court concluded that title to the bed of the navigable south channel was conveyed to the Tribe by the 1874 Executive Order and that no act in the intervening years had divested the Tribe of the title to the riverbed it received in 1874. Thus, the district court ejected Trans-Canada and confirmed the Tribe's title to the former riverbed.
 
 
 7
 With respect to the north channel of the White River, the court recognized that the channel had moved appreciably southward since 1874. The court found that this movement was the result of avulsion rather than accretion or erosion and hence that title to the north channel riverbed as it lay in 1874 remained with the original owner of the riverbed absent a subsequent conveyance. See Puyallup Tribe of Indians v. Port of Tacoma, 717 F.2d 1251, 1261 (9th Cir.1983). Since the district court found no subsequent conveyance, it ejected appellants and confirmed the Tribe's title to the former north channel riverbed as it lay in 1874.
 
 
 8
 Appellants, ejected possessors of the former south and north channel riverbeds, appealed the district court's decision, arguing that the trial court erred in finding a conveyance of the riverbed to the Tribe in the 1874 Executive Order. This court, by order, remanded the case to the district court for reconsideration in light of Montana v. United States, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981). The district court affirmed its original judgment in favor of the Tribe. Trans-Canada has again appealed on the same ground. The appeal is timely.
 
 II
 
 9
 Our decision today in Puyallup Tribe of Indians v. Port of Tacoma, 717 F.2d 1251 (9th Cir.1983), establishes the analytic framework for resolving the question of whether the United States conveyed to the Muckleshoot Tribe in 1874 the bed of part of the White River. In Puyallup, we concluded that
 
 
 10
 where a grant of real property to an Indian tribe includes within its boundaries a navigable water and the grant is made to a tribe dependent on the fishery resource in that water for survival, the grant must be construed to include the submerged lands if the Government was plainly aware of the vital importance of the submerged lands and the water resource to the tribe at the time of the grant.
 
 
 11
 717 F.2d at 1258 (footnote omitted).
 
 
 12
 We reached this conclusion after a careful reading of Montana v. United States, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), and the cases cited therein, especially Alaska Pacific Fisheries v. United States, 248 U.S. 78, 39 S.Ct. 40, 63 L.Ed. 138 (1918), and Skokomish Indian Tribe v. France, 320 F.2d 205 (9th Cir.1963). We gleaned from these cases, first, the proposition that the avoidance of hostilities arising from a tribe's inability to reach a water resource on which it depends for survival can create a "public exigency" within the meaning of Shively v. Bowlby, 152 U.S. 1, 48, 14 S.Ct. 548, 566, 38 L.Ed. 331 (1893), and, second, the principle that, where such an exigency exists, the United States' clear awareness of the tribe's needs taken together with the principle of construction resolving any ambiguities in agreements with the United States in favor of the Indian tribes warrants the further conclusion that the Government intended to meet the tribe's needs by granting to the Indians the land and the water on which they were dependent for survival. See Choctaw Nation v. Oklahoma, 397 U.S. 620, 631, 90 S.Ct. 1328, 1334, 25 L.Ed.2d 615 (1970), cited in Montana v. United States, 450 U.S. at 555-56 n. 5, 101 S.Ct. at 1253-54 n. 5.
 
 
 13
 In this case, each of the requirements set forth in Puyallup (derived from Montana v. United States ) is met.[2] First, as the district court found, the Muckleshoot Tribe's dissatisfaction with its original reservation gave rise to a public exigency because, as "[t]he [Indian] agents and officers repeatedly warned[,] trouble would result unless the [Muckleshoot] Reservation was enlarged" to include one of the Tribe's traditional fisheries. The United States was clearly aware "that the focus of the Muckleshoot's world was on the rivers along which they lived...." The Government knew, at least by the date of the 1874 Executive Order expanding the Muckleshoot Reservation, that the Indians "depended on watercourses, not only for food and materials, but also in their manner of self-identification, language and religious practices." Further, "Muckleshoot ancestors, placed by the United States government on a reservation along the banks of a particular river, would naturally assume that the river belonged to them for their communal use." The Government's Indian agents understood that "[t]he capture of fish was an essential source of [the Indians'] food supply...." Moreover, as in Puyallup, the methods of fishing employed by the Muckleshoot depended on the Tribe's ability to use not only the waters in which they found fish, but also the lands beneath these waters on which they constructed their fish traps and weirs. Finally, and most importantly, unlike the situation in Montana, where the Crow Reservation was designated with no special regard to the fact that it included a section of the Big Horn River, the Muckleshoot Reservation was expanded at the insistence of the Indians specifically to include a section of the White River on which the Tribe could continue to exercise its traditional fishing lifestyle.
 
 
 14
 In light of these facts, it was proper for the district court to conclude that, in 1874 when the United States expanded the Muckleshoot Reservation to include sections of the White River, the Government intended, and the Tribe understood, the grant of an expanded reservation to include the bed of the river and its waters as well as the land along either bank.[3] See Puyallup, 717 F.2d at 1258. Accordingly, the judgment of the district court is AFFIRMED.
 
 
 
 [1]
 The order in its entirety states:
 It is hereby ordered that the following tracts of land in Washington Territory: Sections 2 and 12 of township 20 north, range 5 east, and sections 20, 28 and 34, of township 21 north, range 5 east, Willamette meridian, be withdrawn from sale or other disposition, and set apart as the Muckleshoot Indian Reservation, for the exclusive use of the Indians in that locality, the same being supplemental to the action of the Department approved by the President January 20, 1857.
 The brevity of the Executive Order is not unusual. See, e.g., Skokomish Indian Tribe v. France, 320 F.2d 205, 206-07 (9th Cir.1963) (quoting an executive order of Feb. 25, 1874).
 
 
 [2]
 As in Puyallup, we do not mean to imply that only where these conditions are met is a conclusion that the United States granted the bed of a navigable water to an Indian tribe justified. See Puyallup Tribe of Indians v. Port of Tacoma, 717 F.2d at 1258 n. 7 (9th Cir.1983)
 
 
 [3]
 Trans-Canada does not argue on appeal that the district court erred in its decision on the issues of navigability and the nature of the changes in the river's course. We do not consider, therefore, the district court's resolution of these issues