210 F.3d 1067 (9th Cir. 2000)
 UNITED STATES OF AMERICA, In re suit to quiet title to that portion of the bed and banks of Coeur d'Alene Lake and the St. Joe River lying within the exterior boundaries of the 1873 Coeur d'Alene Reservation,Plaintiff-counterdefendant, Appellee,
v.
STATE OF IDAHO, Defendant-counter-claimant, Appellant-Cross-Appellee,
v.
COEUR D'ALENE TRIBE OF IDAHO,Plaintiff-intervenor, AppelleeCross-Appellant.
 Nos. 98-35831 98-35847.
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted December 9, 1999
Filed May 2, 2000
 
 [Copyrighted Material Omitted]
 COUNSEL: Steven W. Strack, Deputy Attorney General, Natural Resources Division, Boise, Idaho, for defendant-counterclaimant, appellant-cross-appellee State of Idaho.
 Hank Meshorer, United States Department of Justice, Environmental and Natural Resources Division, Washington, D.C., for plaintiff-counter-defendant, appellee United States of America.
 Raymond C. Givens, Givens, Funke & Work, Coeur d'Alene, Idaho, for plaintiff-intervenor, appellee-cross-appellant Coeur d'Alene Tribe of Idaho.
 Appeals from the United States District Court for the District of Idaho; Edward J. Lodge, District Judge, Presiding. D.C. No.CV-94-00328-EJL
 Before: Thomas M. Reavley,[1] Stephen Reinhardt, and M. Margaret McKeown, Circuit Judges.
 McKEOWN, Circuit Judge:
 
 
 1
 At issue in this case is the ownership of submerged lands lying within the present-day boundaries of the Coeur d'Alene Indian Reservation, which was originally set aside by executive order in 1873. After a nine-day trial involving multiple expert and lay witnesses, extensive written reports, scientific studies, and historical documents, the district court issued a lengthy and meticulous decision in which it concluded that the United States retained these submerged lands for the benefit of the Coeur d'Alene Indian Tribe (the "Tribe"). The court thus entered an order quieting title to the beds and banks of the Coeur d'Alene Lake (the "Lake") and the St. Joe River[2] (collectively, the "submerged lands") in favor of the United States, as trustee, and the Tribe, as the beneficially interested party of the trusteeship. The State of Idaho (the "State") appeals that order along with related orders giving the Tribe exclusive right to these submerged lands. We affirm the judgment of the district court. Congress's course of conduct in the late 1880s--in the years immediately preceding Idaho's statehood in 1890--demonstrates that it intended to defeat the State's title to submerged lands within the 1873 reservation.
 
 
 2
 The Tribe cross-appeals the district court's refusal to adjudicate the ownership of other submerged lands located within what is now Heyburn State Park (the "Park"). These lands were part of the Tribe's reservation until 1911, when the United States conveyed them to Idaho to establish a park. We affirm the court's decision with respect to the Park because the complaint, read as a whole, excludes lands within the Park and the United States expressly disclaimed any intent to quiet title to such lands.
 
 BACKGROUND
 
 3
 The district court's extensive Memorandum Decision and Order lays out the general historical backdrop to this case as well as extensive findings of fact. The State has not challenged the district court's factual findings, nor has it challenged the court's conclusion that executive actions reflect a clear intent to include the submerged lands within the 1873 reservation.[3] We thus discuss the factual background only as it relates to the main issue in this case, namely, whether Congress intended to defeat the State's title to these submerged lands.
 
 
 4
 In 1867, more than thirty years before Idaho became a state, a reservation embracing at best a small portion of the Lake was established by executive order. The Tribe was not even aware of this order until after it sent a petition in 1871 to the Commissioner of Indian Affairs (the "Commissioner") requesting a charter for a reservation. Thereafter, the Tribe refused to settle within the confines of the 1867 reservation because it did not include the Tribe's mission or waterways. After learning of the 1867 executive order, the Tribe sent a second petition, in 1872, to the Commissioner, requesting inclusion of the mission and the St. Joe and Coeur d'Alene river valleys. The Tribe's request was based in part on its continuing dependence on water resources; as it noted in its petition, "for a while yet we need have some hunting and fishing."
 
 
 5
 Congress responded in 1873 by authorizing a commission to negotiate with the Tribe for settlement on a reservation. After negotiations, the Tribe agreed to settle within an area considerably larger than the 1867 reservation. The new boundaries included the Coeur d'Alene and St. Joe Rivers as well as the vast majority of the Lake (the "1873 reservation"). An executive order, dated November 8, 1873,[4] set aside this area for the Tribe pending ratification of the 1873 agreement, All subsequent executive and congressional action taken with regard to the reservation nonetheless operated from the understanding that its boundaries were as stated in the 1873 agreement and executive order.[5]
 
 
 6
 In 1885, spurred by concerns due to increasing white settlement pressure, the Tribe again contacted the Commissioner, requesting confirmation of the 1873 reservation and compensation for lands outside that reservation but within the Tribe's aboriginal territory. Congress responded in 1886 by authorizing negotiations with the Tribe "for the cession of their lands outside the limits of the present Coeur d'Alene reservation." Act of May 15, 1886, 24 Stat. 29, 44. Negotiations were undertaken in 1887, and the Tribe agreed to cede its aboriginal title "to all lands in said Territories and elsewhere, except the portion of land within the boundaries of their present reservation in the Territory of Idaho, known as the Coeur d'Alene Reservation" (the "1887 agreement"). Act of March 3, 1891, 26 Stat. 989, 1027 (reciting 1887 agreement). This agreement, like the 1873 agreement, required ratification.
 
 
 7
 While the 1887 agreement was pending before Congress, pressure to open up at least part of the reservation to the public (particularly the Lake), prompted the Senate to pass a resolution in 1888 inquiring of the Secretary of the Interior about the boundaries of the Tribe's reservation and "whether such area includes any portion, and if so, about how much of the navigable waters of Lake Coeur d'Alene, and of Coeur d'Alene and St. Joseph Rivers." S. Res. Mis. Doc. No. 36, 50th Cong. (1888). The Senate also sought advice about "whether it is advisable to release any of the navigable waters aforesaid from the limits of such reservation." Id. Two weeks later, the Secretary replied, stating that the 1873 reservation included the submerged lands at issue and attaching a report by the Commissioner; this report informed Congress that "the reservation appears to embrace all the navigable waters of Lake Coeur d'Alene, except a very small fragment cut off by the north boundary of the reservation" and that portions of the Coeur d'Alene and St. Joseph Rivers flowed through the reservation. Letter from the Secretary of the Interior, S. Ex. Doc. No. 76 at 3, 50th Cong. (1888). The Commissioner opined that "changes could be made in the boundaries for the release of some or all of the navigable waters" and that it would be "an easy matter" to negotiate a cession of the reservation, "including all or a portion of the navigable waters, " once the 1887 agreement had been ratified. Id. at 2.
 
 
 8
 After receiving this response, Congress authorized a third round of negotiations, this time "for the purchase and release by said tribe of such portions of its reservation not agricultural and valuable chiefly for minerals and timber as such tribe shall consent to sell . . . ." Act of March 2, 1889, 25 Stat. 980, 1002. Following negotiations, the Tribe agreed to cede the approximate northern third of its 1873 reservation to the United States; this area included roughly the northern twothirds of the Lake (the "1889 agreement").[6] Act of March 3, 1891, 26 Stat. 989, 1030 (reciting 1889 agreement). The 1889 agreement, like the 1873 and 1887 agreements, required ratification, and, as a condition, the Tribe insisted that the 1887 agreement be ratified. The map submitted to Congress along with the written terms of the agreement showed the boundary of the reservation as bisecting the Lake from west to east at its southern third.
 
 
 9
 Congress formally ratified both the 1887 and 1889 agreements, but not until 1891, Act of March 3, 1891, 26 Stat. 989, nine months after Idaho's admission to the Union. Idaho Admission Bill, Act of July 3, 1890, 26 Stat. 215. This statehood act also "accepted, ratified, and confirmed " the Idaho constitution, id. S 1, which disclaims the State's "right and title to . . . all lands lying within said limits owned or held by any Indians or Indian tribes." IDAHO CONST. art. XXI, S 19.
 
 
 10
 Prior to Idaho's admission, the House introduced and the Senate passed separate but identical bills[7] ratifying the 1887 and 1889 agreements, but due to uncertainty in the House over whether the bills were the same, the House tabled the Senate bill pending investigation of this question, 21 CONG. REC. 5905 (1890), which was ultimately resolved in the affirmative, H.R. REP. NO. 2988, 51st Cong., at 1 (1890). Two House reports, which recommended passage of the bill, see id. and H.R. REP. NO. 1109, 51st Cong., at 5 (1890),[8] and which indicate recognition of the submerged lands as part of the Tribe's reservation at the time of statehood, further explained that the 1887 agreement had not been ratified when first presented
 
 
 11
 for sundry reasons, among which was a desire on the part of the United States to acquire an additional area, to wit, a certain valuable portion of the reserva tion specifically dedicated to the exclusive use of said Indians under an Executive order of 1873 . . . [that] contains a magnificent sheet of water, the Coeur d'Alene Lake, and its chief tributary, to wit, the Coeur d'Alene River, over the waters of which steamers now ply daily . . . . It also controls the out let of said lake, to wit, the Spokane River.
 
 
 12
 H.R. REP. NO. 1109, at 4,reprinted in H.R. REP. NO. 2988, at 5.
 
 
 13
 Today, the boundaries of the reservation remain as established in the 1887 and 1889 agreements, with two exceptions: 1) the Harrison cession (negotiated by agreement in 1894), a strip of land running from the mouth of the Coeur d'Alene River to the reservation's eastern boundary and including a defined chunk of the Lake; and 2) the Park, an area transferred to Idaho by Congress in 1911 and embracing three smaller lakes adjacent to the southern end of the Lake.
 
 
 14
 The United States, seeking to quiet title to submerged lands within the present-day reservation, initiated this action in its own capacity and as trustee for the Tribe. The district court granted the Tribe's motion to intervene, subject to the limitation that the suit would encompass only those submerged lands put at issue by the parties' pleadings. The court declined the Tribe's request that it adjudicate the ownership of submerged lands within the Park.
 
 
 15
 Following trial, the district court ruled in favor of the United States and the Tribe on the quiet title action. The court found that the submerged lands lay within the boundaries of the present-day reservation, that in 1873 the Tribe depended on the Lake and associated rivers for a significant portion of its fishing needs, and that in 1873 the federal government was aware of this dependence. The court then concluded that the Executive intended to reserve submerged lands within the 1873 reservation for the benefit of the Tribe. The State has challenged neither these factual findings nor the court's legal conclusion on executive intent.
 
 
 16
 The court also found that Congress was on notice, prior to Idaho statehood, that the Executive had reserved the submerged lands within the 1873 reservation for the benefit of the Tribe; that the "northern boundary line of the diminished reservation was drawn [in the 1889 agreement] so as to bisect the Lake"; and that the minutes of the 1889 negotiations showed that this placement was "for the purpose of establishing the Tribe's right to the Lake and rivers." Looking at events between 1873, after the executive order established the reservation within which the Tribe had agreed to settle, and 1890, the year Idaho entered the Union, the court concluded that Congress ratified the 1873 executive reservation of submerged lands. The court explained that "[b]y explicitly recognizing, prior to Idaho's statehood, an Executive reservation that included submerged lands, Congress demonstrated a clear intent to defeat the State's equal footing title. " It is this conclusion that the State challenges on appeal.
 
 ANALYSIS
 
 17
 We review de novo the district court's interpretation of treaties, statutes, and executive orders. See Confederated Tribes of Chehalis Indian Reservation v. Washington , 96 F.3d 334, 340 (9th Cir. 1996); United States v. Washington, 157 F.3d 630, 642 (9th Cir. 1998) (meaning of treaty language is question of law, reviewed de novo). Findings of historical fact, including the district court's findingsregarding treaty negotiators' intentions, are reviewed for clear error. See United States v. Washington, 157 F.3d at 642. Because the State does not appear to have challenged any of the court's underlying factual findings, we accept the facts as given and note that they are amply supported by the record.
 
 
 18
 Juxtaposed in this case are two principles, both of which must be accorded due weight: the canon of construction favoring Indians and the presumption under the Equal Footing Doctrine that a State gains title to submerged lands within its borders upon admission to the Union. See Puyallup Indian Tribe v. Port of Tacoma, 717 F.2d 1251, 1257 (9th Cir. 1983) (stating that, "when faced with a claim [to submerged lands] by an Indian tribe . . . , we must accord appropriate weight to both the principle of construction favoring Indians and the presumption that the United States will not ordinarily convey title" to such lands).
 
 
 19
 The Supreme Court's trilogy of decisions in United States v. Alaska, 521 U.S. 1 (1997), Utah Division of State Lands v. United States, 482 U.S.193 (1987), and Montana v. United States, 450 U.S. 544 (1981), provides the framework for analyzing whether a state's presumptive title to submerged lands within its borders has been defeated. In Alaska, the Supreme Court reaffirmed the two-prong test set forth in Montana and Utah for determining whether a state's presumptive equal footing title to submerged lands within its borders has been defeated. As framed by the Supreme Court, the question before us is "whether the United States intended to include submerged lands within the [reservation ] and to defeat [Idaho's] title to those lands. See Alaska , 521 U.S. at 36.
 
 
 20
 Although executive action has now been held sufficient to establish the first prong, the second prong requires a showing of congressional intent. See Alaska, 521 U.S. at 40-41, 44. Nothing in Alaska requires that congressional action take the form of explicit congressional ratification of an agreement reserving or conveying title to particular submerged lands. Rather, the Supreme Court has framed the question as whether Congress intended to defeat the state's title to the lands at issue, see id. at 36; Utah, 482 U.S. at 202; notably, the Supreme Court has not required that the requisite intent be established in any specific, formulaic way, focusing instead on whether the congressional action at issue showed an affirmative intent to defeat state title, that is, whether the "intention was definitely declared or otherwise made very plain." United States v. Holt State Bank, 270 U.S. 49, 55 (1926). As the Court in Alaska pointed out in rejecting the state's argument to the contrary:
 
 
 21
 [T]here would have been no barrier to Congress retaining a petroleum reserve, including submerged lands, at the point of Alaska's statehood, provided it satisfied Utah['s] . . . requirements of demonstrating a clear intent to include submerged lands within the Reserve's scope and a clear intent to defeat Alaska's title. It follows that Congress could achieve the same result by explicitly recognizing, at the point of Alas ka's statehood, an executive reservation that clearly included submerged lands.
 
 
 22
 Alaska, 521 U.S. at 44.
 
 
 23
 Given the State's concession, for purposes of this appeal, that the 1873 executive order was intended to convey or reserve title to submerged lands, we focus on the second prong--whether Congress demonstrated an intent to defeat the State's title to the submerged lands. We conclude that Congress's actions prior to statehood clearly indicate its acknowledgment, express recognition, and acceptance of the executive reservation, thereby establishing its intent to defeat the State's title. Accordingly, we affirm the district court's ruling quieting title to submerged lands within the present-day Coeur d'Alene Reservation for the benefit of the Tribe. In light of our decision, we need not reach the Tribe's alternative arguments for affirmance.
 
 I. The State's Appeal--Submerged Lands
 
 24
 Relying on the events leading up to and surrounding the 1889 negotiations, the district court held that Congress demonstrated a clear intent to defeat the State's equal footing title. In particular, the court found that Congress was on notice that the executive reservation included submerged lands and that its 1889 authorization of negotiations with the Tribe for a cession of tribal property constituted recognition and validation of the executive reservation. Idaho argues that none of the events leading up to its statehood in 1890 constitute affirmative ratification of the executive intent to convey or reserve the submerged lands and thus cannot show congressional intent to defeat state title to these lands.
 
 
 25
 In any submerged lands/equal footing case, a court must begin with a strong presumption against defeat of a state's title. See Alaska, 521 U.S. at 34. The Supreme Court has emphasized, however, that the question of whether title to submerged lands rests with a state is "ultimately a matter of federal intent." Id. at 36.
 
 
 26
 In Alaska itself, the Court held that the United States reserved title to the submerged lands within a petroleum reserve created by executive order 35 years prior to Alaska's statehood, see id. at 32-46, and to submerged lands within a wildlife refuge set aside by agency action (via an application and regulations) prior to statehood but not approved until after statehood, see id. at 46-61. In finding that the United States intended to include submerged lands within these reserved areas and to defeat state title to the lands, the Court emphasized that: 1) the reserves' boundaries were drawn so as necessarily to include the submerged lands, see id. at 36, 51; 2) the purpose of the reserves would have been defeated had the lands not been included, see id. at 39, 51-52; and 3) Congress included language in the Alaska Statehood Act indicating that it retained Enclave Clause authority to the petroleum reserve, see id. at 41-42, and title to lands withdrawn or otherwise set aside as refuges for the protection of wildlife, see id. at 55-56.
 
 
 27
 In this case, several similar factors counsel the same result.[9] First, in both 1873 and 1889, the boundaries of the reservation were drawn so as necessarily to include submerged lands. Second, the purpose of the reservation would have been defeated had it not included these lands. Third--and this is the crux of the case--the series of congressional actions taken in the late 1880s (ascertaining that the Executive construed the reservation to include submerged lands and authorizing negotiations to recover whatever portion of the lands the Tribe was willing to sell) shows that Congress acknowledged that beneficial ownership of the lands had already passed to the Tribe. Congress's post-statehood actions also reflect recognition and confirmation of the passage of submerged lands to the Tribe. Both before and after statehood, Congress affirmatively treated the submerged lands as reserved for the Tribe.
 
 
 28
 We begin with the manner in which the boundaries of the reservation were determined. The reservation, which physically encompassed the submerged lands at issue, was created by a pre-statehood, 1873 executive order that drew the boundaries so as necessarily to include submerged lands. Crucial to the Tribe's acceptance of the 1873 reservation, as the district court found and the State does not dispute, was the inclusion of submerged lands. In addition, and significantly, when the 1873 boundaries were renegotiated in 1889, the "northern boundary line of the diminished reservation was drawn so as to bisect the Lake" specifically "for the purpose of establishing the Tribe's right to the Lake and rivers." The State likewise does not dispute this factual finding.
 
 
 29
 Both the Tribe and the agents sent out at the behest of Congress in 1889 understood the reservation to encompass submerged lands. As noted, the reservation's boundaries were redrawn by the 1889 agreement to split the lake--a fact recognized in the legal descriptions of the cession, the verbal explanation given to the Tribe,[10] and the maps submitted to Congress. As we recognized in another case in which we upheld tribal claims to submerged lands under the half of a lake within the borders of a reservation, "[i]t would have been pointless, and quite likely deceptive, to have the northern boundary of the reservation bisect Flathead Lake unless it was intended to convey title to the southern half of that lake to the Indians." Confederated Salish & Kootenai Tribes v. Namen, 665 F.2d 951, 962 (9th Cir. 1982) (further noting that "the most natural and intelligible way of understanding the boundary description is to infer an intent to convey the southern lake bed" and adopting this interpretation "in view of the Supreme Court's very frequent admonitions that doubtful language in Indian treaties must be construed in favor of the Indians and given the sense the Indians would have understood it to convey"). This observation is equally pertinent
 
 
 30
 Considering together the district court's undisputed factual findings, the canon favoring Indians, and the fact that both the 1873 and 1889 agreements drew boundary lines across the lake--an unusual practice, as the district court pointed out--the executive reservation and subsequent renegotiation could only have been meant and understood to convey title to submerged lands within the reservation's borders.
 
 
 31
 This conclusion finds further support in the fact that the purpose of the reservation would have been defeated had it not included submerged lands. As the district court found, and as the State does not challenge, the Tribe was dependent on its fisheries in 1873. The Tribe successfully insisted, both in 1873 and 1889, upon a reservation drawn to include submerged lands. In 1873, the reservation was expanded from its 1867 borders because the Tribe refused to settle on lands that did not encompass the Lake and its associated waterways. In 1889, the borders of the reservation were contracted and redrawn--but redrawn so as to ensure that the Tribe still had beneficial ownership of the southern third of the Lake as well as the portion of the St. Joe River within the 1873 reservation.
 
 
 32
 The State's argument that the district court should have determined the purpose of the reservation as understood by Congress (rather than the Executive), and as so understood in 1889 (rather than 1873) lacks support in the case law. In Alaska, where the Supreme Court relied heavily on the purpose of the reserves at issue, the Court did not require either that Congress itself apprehend the purpose or that the purpose be extant at the time of congressional action. See Alaska, 521 U.S. at 39, 51-52. The Court examined the purpose of the petroleum reserve, for instance, with regard to the government's goal in 1923, when the Executive reserved the lands, rather than by reference to 35 years later when Congress passed the statehood act referencing its authority over the reserve. See id. at 39, 41-42. What mattered was that Congress recognized that the executive reservation included submerged lands, not that it knew or acknowledged the executive purpose in reserving them.[11] See id. at 44 (providing for a showing that title to submerged lands does not pass to a state where Congress "explicitly recogniz[ed], at the point of . . . statehood, an executive reservation that clearly included submerged lands"). Thus, it is irrelevant that Congress may have believed the Tribe to have wholly or mainly converted to an agricultural lifestyle by 1889. Here there is no dispute that the government's negotiators and agents were aware of the Tribe's dependence on fishing in 1873. Indeed, even Congress was specifically on notice of this dependence as a result of the Tribe's second, 1872 petition. What matters, however, is Congress's awareness that the 1873 reservation included submerged lands, an issue about which there can be no doubt given the response to the 1888 resolution.
 
 
 33
 Turning now to the actions Congress took with respect to the reservation in the late 1880s, we conclude that this series of actions demonstrates acknowledgment, recognition, and acceptance of the boundaries of the 1873 reservation, which Congress knew the Executive had construed to include submerged lands, thereby showing the requisite intent to defeat state title.
 
 
 34
 Formal ratification, prior to statehood, of the 1887 and 1889 agreements is not necessary for a finding of congressional intent to defeat state title.[12] Neither the Supreme Court nor any of our cases require such a showing. Rather, the test is whether Congress clearly intended to defeat the State's title to submerged lands. Here, Congress's course of conduct in ascertaining in 1888 that the Executive construed the reservation to include submerged lands and then authorizing negotiations in 1889 to purchase and thereby recover whatever portion of those lands the Tribe was willing to sell demonstrates its acknowledgment that beneficial ownership of the lands had passed to the Tribe.
 
 
 35
 As the district court found, when Congress authorized these negotiations, it was clearly on notice that the 1873 executive reservation included submerged lands within its confines.[13] Congress also had the unratified 1887 agreement before it, an agreement that referenced the Tribe's "present[1873] reservation in the Territory of Idaho, known as the Coeur d'Alene Reservation" and that secured the cession, pursuant to Congress's 1886 authorization, of aboriginal lands "outside the limits of the present [1873] Coeur d'Alene reservation."
 
 
 36
 Although Congress had the opportunity and the power to repudiate the executive reservation and the 1887 agreement, it did not do so. Instead, in 1889 it took affirmative action, choosing to authorize negotiations--with few limitations aside from an instruction to acquire non-agricultural lands[14] --"for the purchase and release by said tribe of such portions of its reservation . . . as such tribe shall consent to sell" (emphasis added). Act of March 2, 1889, 25 Stat. 980, 1002. The express reference to the reservation as the Tribe's reservation, explicit recognition that the choice to sell was the Tribe's, and reference to tribal release of portions of its reservation all manifest an awareness and acceptance by Congress of the boundaries of the 1873 reservation--boundaries that included submerged lands. This series of events indicates that Congress accepted the Secretary's advice to leave any cession up to negotiations. Indeed, the fact that Congress decided to make its authorization open-ended reinforces the district court's conclusion that Congress recognized and accepted the Tribe's beneficial ownership of all lands--including submerged lands--within the 1873 reservation; it also shows Congress's recognition of the uncertainty of regaining any land at all, and its particular desire to recover whatever submerged lands it could.
 
 
 37
 In short, Congress "otherwise made very plain," Holt State Bank, 270 U.S. at 55,its intention regarding the submerged lands. With the 1887 agreement and the response to the 1888 resolution before it, Congress, fully aware of the boundaries of the 1873 reservation and the extent of the submerged lands that were within it, sought to modify the boundaries described in the agreement--and it sought to do so via purchase rather than the simpler expedient of rejecting the executive reservation. Although Congress may have been unhappy to learn that the executive reservation included submerged lands, its actions show recognition and acceptance of the passage of beneficial ownership to the Tribe, for it sought to regain as much submerged land as possible. The affirmative course of action on which Congress embarked in 1889 -open-ended negotiations to purchase whatever nonagricultural land, particularly submerged lands, the Tribe was willing to cede--presupposes that beneficial ownership of all land within the 1873 reservation, including submerged lands, had already passed to the Tribe.
 
 
 38
 To the extent that the State argues that reversal is necessary because the district court erred in relying on the disclaimer clause in the Idaho constitution,[15] we reject this challenge. We do not read the district court's brief discussion of this clause as integral to its ruling. Nor, for that matter, do we believe reliance on the clause is necessary to affirm the judgment quieting title to submerged lands within the present-day reservation. To the extent the clause is considered at all, however, it weighs in favor of the conclusion we have reached, for it disclaims title to land "held by" Indians. The lands in question were held by the Tribe, and Congress affirmed this provision when it ratified the Idaho constitution.[16]
 
 
 39
 We also note that although Congress has never undertaken by general laws to dispose of submerged lands, this case involves much more than a simple disclaimer clause or a general reference in the Idaho Admission Bill to accepting, ratifying, or confirming the Idaho constitution. Congress was heavily involved in deciding the fate of the submerged lands set aside for the Tribe's benefit by executive order. Congress treated the submerged lands as beneficially owned by the Tribe--to the point of authorizing negotiations for cession of whatever portion of the Tribe's submerged lands it was willing to sell. The State's citation to Alaska v. Ahtna, Inc., 891 F.2d 1401 (9th Cir. 1989), is not instructive. There a provision in the Alaska constitution disclaiming all right and title to property that "may be held" by or in trust for natives stood alone, with no prior or specific congressional action referencing the submerged lands at issue, see id. at 1405-06; in addition, the executive conveyance in Ahtna did not occur until well after Alaska's statehood. See id. at 1403.
 
 
 40
 Finally, we note that in addition to the series of congressional actions prior to Idaho's statehood, Congress's post-statehood actions also reflect recognition and confirmation that submerged lands had passed to the Tribe. prior to Idaho's statehood. Although these post-statehood events are not in themselves demonstrative of pre-statehood intent, nor are they central to our decision, neither can they be wholly ignored.[17]
 
 
 41
 Among these events, the most notable is the 1894 Harrison cession, which was ratified just five years after the 1889 authorization to negotiate. The United States negotiated with the Tribe for the cession of a narrow strip of land extending from the Lake to the eastern boundary of the reservation. During the negotiations, the parties referred to the 1889 agreement as having created a boundary line in relation to the Lake, and they explicitly included a corner of the Lake in the cession. A cession that included a portion of the lake bed would not have been necessary absent a contemporary understanding that the Tribe had beneficial ownership of the bed. Moreover, as was the case with the 1889 agreement, the map submitted to Congress depicted the cession as including part of the bed, literally creating a right angle in the water. This poststatehood acknowledgment of tribal ownership of the lake bed is further confirmation, or reaffirmation, of the status of the submerged lands within the reservation. It is tantamount to a memorialization of prior events, especially given that nothing occurred between statehood and the negotiations for the Harrison cession that altered the ownership situation. Just as Congress would not have negotiated with the Tribe for land the Tribe did not own, so too the United States, on behalf of the Tribe, would not have ceded to the State land that the State already owned.
 
 
 42
 The same can be said for the course of events leading to the creation of the Park. In 1908, Congress withdrew from allotment, for use as a park, a portion of the reservation embracing three smaller lakes adjacent to the southern end of the Lake, and in 1911 it formally transferred this area to the State. There would have been no need for the United States to withdraw the lands comprising the Park from the reservation and no need for the United States to convey these lands by patent to the State if the State already owned them. We thus have another significant example of the contemporary understanding of all parties concerned with regard to the Tribe's beneficial ownership of submerged lands within its reservation.
 
 
 43
 II. The Tribe's Cross-Appeal--Heyburn State Park
 
 
 44
 The cross-appeal raises the question of whether the district court erred in refusing to decide ownership of submerged lands within the Park. We must decide whether the parties' pleadings[18] --specifically, the United States' complaint and theState's counterclaim--put at issue submerged lands within the Park. Resolution of this question requires a careful and commonsense reading of the pleadings. We reject the crossappeal because the complaint, read as a whole, does not include lands within the Park and the United States disavowed any intent to quiet title to submerged lands within the Park. Further, the relief the State seeks in its counterclaim largely mimics the United States' prayer for relief, and the State has likewise disclaimed any intent to litigate issues beyond those raised in the United States' complaint. Accordingly, we conclude that the district court properly declined to adjudicate the ownership of these submerged lands.
 
 
 45
 Neither the complaint nor the counterclaim put submerged lands within the Park at issue. The complaint, taken as a whole, is most naturally read to exclude these lands. First, it specifically identifies the lands that comprise the Park as having been "withdr[awn] from allotment" and "reserved" by the United States. It then juxtaposes these lands, along with other lands that the Tribe ceded to the United States, with lands identified as "still remaining within the Coeur d'Alene 1873 Reservation." The implication is that the United States sought to exclude any lands within the Park from the ambit of the complaint. In addition, the complaint's prayer for relief repeatedly makes reference to the "approximate southern onethird of Coeur d'Alene Lake as well as those portions of the beds and banks of the St. Joe River located within the 1873 Coeur d'Alene Indian Reservation." That the complaint references a specific part of the Lake and the St. Joe River while mentioning none of the three lakes that were the subject of the conveyance to the State strongly suggests that the United States sought to exclude the Park from this quiet title action.
 
 
 46
 Our reading of the complaint is supported by the conduct of the United States throughout this litigation. Significantly, the United States has pursued this action, both in the district court and on appeal, only as to submerged lands within the present-day boundaries of the reservation. Indeed, at the district court level, the United States expressly disavowed any claim to submerged lands within the Park. Under these circumstances, we will not read the more general language in the complaint's caption and preliminary statement, which refer to portions of the Lake and St. Joe River within the exterior boundaries of the 1873 reservation, as extending to submerged lands within the Park.
 
 
 47
 We also reject the Tribe's argument that the State itself put submerged lands within the Park at issue via a counterclaim in which it asserted that it was "entitled to a judgment . . . quieting its title to the beds and banks of those portions of Lake Coeur d'Alene and the St. Joe River located within Heyburn State Park."[19] Although the counterclaim incorporates the allegations in an affirmative defense claiming title to "all lands within" the Park, the State's prayer for relief largely mimics the United States' prayer, which is far narrower than the affirmative defense. In its prayer for relief, the State seeks to quiet title to "those portions of Lake Coeur d'Alene and the St. Joe River within the present boundaries of the Coeur d'Alene Reservation and Heyburn State Park." Notably, and in contrast to its affirmative defense, the State does not name in its prayer for relief any of the three lakes originally embraced by the Park, and it has consistently disclaimed any attempt to litigate any issue beyond that raised in the United States' complaint.
 
 
 48
 Because the United States disavowed any claim to submerged lands within the Park, the State disavowed intent to litigate any issue beyond that raised by the United States, and a fair reading of the relief requested in both the complaint and counterclaim does not, under the circumstances, encompass lands within the Park, the district court properly declined to adjudicate the ownership of submerged lands within the Park.
 
 
 49
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 The Honorable Thomas M. Reavley, Senior United States Circuit Judge for the United States Court of Appeals, Fifth Circuit, sitting by designation.
 
 
 [2]
 Referred to in certain historical documents as the St. Joseph River.
 
 
 [3]
 For purposes of this appeal, the State concedes that the 1873 executive order was intended to reserve title to the submerged lands for the benefit of the Tribe.
 
 
 [4]
 Executive Orders Relating to Indian Reservations, From May 14, 1855 to July 1, 1912, Washington, D.C., Government Printing Office (1912) at 72. which was contingent on congressional approval, but such approval never came.
 
 
 [5]
 For instance, an 1883 government survey located the reservation's northen boundary across the Lake, consistent with the 1873 agreement and executive order; the Executive dealt with both commercial and recreational use of the Lake by non-Indians on the assumption that the laws governing Indian territory governed; Congress spoke of the 1873 reservation as "set apart for the use of the Coeur d'alene Indians by executive order" and described its borders in an 1888 act granting a railroad a conditional right of way through the reservation, Act of May 18, 1888, 25 Stat. 60; Congress referenced the 1873 boundaries in its 1889 authorization of negotiations "for the purchase and release by said tribe of such portions of its reservation not agricultural and valuable chiefly for minerals and timber as such tribe shall consent to sell...' Act of March , 1989, 25 Stat. 980, 1002.
 
 
 [6]
 The Tribe's chief insisted on carefully defining the new proposed boundaries, rejecting the suggestion that the "lake belongs to [the Tribe] as well as to the whites." Message from the President of the United States, S. Ex. Doc. No. 14, 51st Cong. (1889), at 9. A government negotiator then explained the proposed boundaries as follows: "[I]f we buy this land you still have the St. Joseph River and the lower part of the lake and all the meadow and agricultural land along the St. Joseph River." Id.
 
 
 [7]
 H.R. 7703, 51st Cong. (1890); S. 2828, 51st Cong. (1890), 21 CONG. REC. 5769 (1890).
 
 
 [8]
 H.R. REP. NO. 2988 contains a reprint of H.R. REP. NO. 1109.
 
 
 [9]
 We recognize that, in Alaska , the Supreme Court discussed the first two factors identified here--namely, the purpose of the reserves and the fact that their boundaries were drawn so as necessarily to include submerged lands--mainly with respect to whether the United States intended to include the submerged lands within the reserves. These factors likewise support a finding of executive intent to include in this case, as the State concedes for purposes of appeal. We also discuss these factors with respect to the "intent to defeat" prong for two reasons. First, the State argued that Alaska involved a "unique combination of necessity, purpose, and explicit statutory language" and also argued that the district court short-circuited the "purpose" analysis by "failing to determine Congress'[s] understanding of the purpose of the Reservation at the time of the alleged ratification of the 1873 Executive order. " Second, under the circumstances of this case, Congress's knowledge of the scope of the executive reservation--in particular, the boundaries of the reservation and the fact that they included submerged lands--is crucial. Accordingly, it is helpful to outline precisely what information Congress had before it.
 
 
 [10]
 After the Tribe specifically rejected the suggestion that the "lake belongs to [it] as well as to the whites," a government negotiator told the Tribe that it "would still have the St. Joseph River and the lower part of the lake . . . ."here, where the natural reading of all available documentation points to a purposeful division of the Lake.
 
 
 [11]
 Even cases specifically addressing tribal claims of right to submergedlands do not require that Congress apprehend the purpose of the reservation at the time it takes action recognizing the executive reservation. Rather, they focus on what the "United States " or the "government" knew as of the initial reservation. See, e.g., United States v. Aam, 887 F.2d 190,195, 197 (9th Cir. 1990) (stating that "where courts have reviewed tribal claims of beneficial title to land under navigable waters, the inquiry focused on the circumstances surrounding the creation of the reservation"and noting "insufficient proof that the United States [by its officials or agents] perceived that the tribe depended on those particular tidelands");Muckleshoot Indian Tribe v. Trans-Canada Enterprises, Ltd., 713 F.2d 455, 458 (9th Cir. 1983) (stating that "the United States was clearly aware that the focus of the Muckleshoot's world was on the rivers along which they lived"; that "[t]he Government knew, at least by the date of the 1874 Executive Order expanding the Muckleshoot Reservation, that the Indians depended on watercourses"; and that "[t]he Government's Indian agents understood that [t]he capture of fish was an essential source of [the Indians'] food supply") (internal quotations omitted); Puyallup Indian Tribe, 717 F.2d at 1258 (noting "the Government's awareness of the importance of the water resource to the Tribe").
 
 
 [12]
 Nor is inclusion of language in a statehood act--here the Idaho Admission Bill--specifying congressional intent to defeat state title necessary to a finding that Congress did, in fact, intend to defeat a state's title to particular submerged lands. In Alaska, the Supreme Court looked to the Alaska Statehood Act as a source of congressional intent in concluding that Congress intended to defeat Alaska's title to the petroleum reserve and wildlife refuge. See Alaska, 521 U.S. at 41-42, 55-56. Statehood acts, however, do not--and have never been held to--serve as exclusive sources of congressional intent with respect to the question of congressional intent to defeat state title.
 We also note that there is significantly more evidence of congressional intent with regard to the submerged lands in this case than with regard to the wildlife refuge in Alaska. The Supreme Court found clear intent to defeat Alaska's title to the submerged lands within this wildlife refuge as a result of a fairly general provision of the Alaska Statehood Act. Under that provision, the United States retained "lands withdrawn or otherwise set apart as refuges or reservations for the protection of wildlife." Id. at 47,55. Not only had the refuge in Alaska not yet been approved at the time of statehood--an administrative application for withdrawal of the lands in the proposed refuge was still pending when Congress passed the statehood act and when Alaska subsequently entered the Union--but Congress took no action either prior to or at statehood specifically with regard to the refuge at issue. By contrast, in this case, before statehood, Congress was often and actively involved in deciding the fate of the submerged lands within the Tribe's reservation.
 
 
 [13]
 Similarly, Congress's 1888 passage of an act granting a railroad a right-of-way through the reservation, identified as "set apart for the use of the Coeur d'Alene Indians by executive order, commonly known as the Coeur d'Alene Reservation," and conditioned on the Tribe's consent, also supports congressional recognition of the 1873 reservation, which Congress by this point knew included submerged lands.
 
 
 [14]
 The events surrounding the authorization clearly show that the main purpose of the new negotiations was to regain from the Tribe whatever submerged lands it was willing to sell. The State itself notes that "as the district court recognized, the 1889 . . . Act was an authorization `to negotiate with the Tribe of a release of the submerged lands' " (quoting district court decision). Relevant events include the 1888 resolution; the response to that resolution; the events leading up to the resolution, such as the pressure, brought to Congress's attention, to open up the Lake; the negotiations themselves, which focused heavily on boundaries as they affected submerged lands; and a subsequent report from the Department of the Interior, which noted that little agricultural land had been acquired. See Message from the President, S. Ex. Doc. No. 14, at 2.
 
 
 [15]
 This clause, found in article XXI, S 19, of the Idaho constitution, reads: ". . . . And the people of Idaho do agree and declare that we forever disclaim all right and title . . . to all lands lying within said limits owned or held by any Indians or Indian tribes[.]"
 
 
 [16]
 That such a disclaimer clause may be declaratory, conferring no new right or power on the United States, is immaterial. The substance of a declaratory clause is not meaningless, even if the clause itself is unnecessary in that it merely recognizes a preexisting interest. See United States v. Gardner, 107 F.3d 1314, 1320 (9th Cir. 1997) (finding constitutional clause disclaiming title to unappropriated public lands and explaining that although the U.S. "did not need the disclaimer clause to gain title to the public lands in Nevada," such a declaratory clause of a preexisting U.S. right to administer its property is valid). We also reject as inapplicable to this case the State's argument that Congress cannot require states to disclaim rights of sovereignty as the price of admission to the Union. Congress did not do so here. All Congress did was to acknowledge and ratify, through its course of conduct, the executive reservation of certain submerged lands for the benefit of the Tribe.
 
 
 [17]
 Although the State suggests that post-statehood events may not be considered in assessing congressional intent, we are aware of no rule forbidding consideration of such events. Indeed, the case law may suggest the contrary. See Alaska Pacific Fisheries v. United States, 248 U.S. 78, 89-90 (1918) (finding support for conclusion that Congress intended to include submerged lands within reservation in subsequent conduct whereby reservation was treated as including submerged lands). Cf. Aam, 887 F.2d at 194 (district court did not abuse its discretion in finding that matters occurring after Washington's admission in 1889 were too remote to be probative of the intent of the parties to an 1855 treaty or of the Secretary's intent upon enlargement of the reservation in 1864). Notably, Aam does not set forth any general rule barring post-statehood evidence, and it is also readily distinguishable, for the substantial time gap--40 years-motivating the Aam decision is not present here.
 
 
 [18]
 In construing the parties' pleadings, we bear in mind that the current physical situation in and around the Park differs from the situation that existed in 1873, at the time of the executive reservation, and in 1908 and 1911, the years, respectively, that the Park was authorized and conveyed to the State. Due to the construction of a dam, three small lakes have combined with the Lake into one large body of water. We read the United States' complaint in light of the physical situation as it existed prior to the construction of the dam.
 
 
 [19]
 The State's answer included two sections referencing the Park: 1) an affirmative defense in which the State claimed title to "all lands within Heyburn State Park as a result of . . . federal actions" authorizing the Park and conveying its lands to the State by patent; and 2) the above-quoted counterclaim. Only the counterclaim is at issue.