**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 41212**

| | | |
|---|---|---|
| **STATE OF IDAHO,** | ) | **2014 Opinion No. 38** |
| | ) | |
| **Plaintiff-Respondent,** | ) | **Filed: May 7, 2014** |
| | ) | |
| v. | ) | **Stephen W. Kenyon, Clerk** |
| | ) | |
| **STEPHEN D. L'ABBE,** | ) | |
| | ) | |
| **Defendant-Appellant.** | ) | |
| | ) | |

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Hon. Michael R. McLaughlin, District Judge; Theresa Gardunia, Magistrate.

Order, on intermediate appeal, affirming judgment of conviction for speeding, affirmed.

Stephen D. L'Abbe, Boise, pro se appellant.

Hon. Lawrence G. Wasden, Attorney General; Lori A. Fleming, Deputy Attorney General, Boise, for respondent.

_____

GUTIERREZ, Chief Judge

Stephen D. L'Abbe appeals from the district court's intermediate appellate decision affirming L'Abbe's judgment of conviction for speeding, a violation of Idaho Code § 49-654(2), entered by the magistrate court. Generally, L'Abbe makes two arguments: (1) the magistrate court was without subject matter jurisdiction or personal jurisdiction to try him; and (2) the magistrate erred by ruling that L'Abbe was not entitled to a Seventh Amendment jury trial on his speeding citation. For the reasons set forth below, we affirm.

## I.

## FACTS AND PROCEDURE

L'Abbe was cited by a Boise police officer for speeding. L'Abbe pled not guilty to the citation and a court trial was set. Prior to the court trial, L'Abbe filed several motions generally challenging the State of Idaho's authority and jurisdiction over him. At trial, L'Abbe made a record of his arguments challenging the State's authority and jurisdiction. All of his motions

1

were denied.[1]  The magistrate found that L'Abbe violated Idaho Code § 49-654(2) by driving 38 mph in a 25 mph zone and entered a judgment of conviction.  L'Abbe appealed to the district court, which affirmed the judgment of conviction entered by the magistrate court.  L'Abbe now appeals to this Court.

## II.

## STANDARD OF REVIEW

When reviewing the decision of a district court sitting in its appellate capacity, our standard of review is the same as expressed by the Idaho Supreme Court:

> The Supreme Court reviews the trial court (magistrate) record to determine whether there is substantial and competent evidence to support the magistrate's findings of fact and whether the magistrate's conclusions of law follow from those findings.  If those findings are so supported and the conclusions follow therefrom and if the district court affirmed the magistrate's decision, we affirm the district court's decision as a matter of procedure.

*Pelayo v. Pelayo*, 154 Idaho 855, 858-59, 303 P.3d 214, 217-18 (2013) (quoting *Bailey v. Bailey*, 153 Idaho 526, 529, 284 P.3d 970, 973 (2012)).  Thus, the appellate courts do not review the decision of the magistrate court.  *Bailey*, 153 Idaho at 529, 284 P.3d at 973.  Rather, we are procedurally bound to affirm or reverse the decisions of the district court.  *State v. Korn*, 148 Idaho 413, 415 n.1, 224 P.3d 480, 482 n.1 (2009).

## III.

## HISTORY OF STATE COURTS' JURISDICTION

This Court understands L'Abbe's concerns to be centered on the legality of the judiciary, as well as the State's other government departments, enforcing the State's laws over L'Abbe and other Idaho citizens.  L'Abbe believes the State of Idaho is only a corporate body, which should only have authority to enforce laws over individuals who contracted with it.  As this is the third time in less than two years that L'Abbe has appeared before this Court, asserting similar issues in all three cases, it is apparent that this Court's previous analyses have done little to assuage L'Abbe's chief concern.  Additionally, a growing number of Idaho's citizens have expressed views similar to L'Abbe's.  With that in mind, this Court believes it is important to more fully

---

[1]  The underlying facts of the case are uncontroverted and were not challenged on intermediate appeal.  The State presented its case through the Officer's testimony, which was not challenged on intermediate appeal.

analyze the history of Idaho courts' jurisdiction. We will now take the opportunity to attempt to inform and educate L'Abbe and others similarly situated.

## A.     Authority of the States Before Adoption of the United States Constitution

Throughout L'Abbe's briefs are express and implied references to the State of Idaho's lack of authority to pass, approve, execute, expound, and enforce state laws. However, L'Abbe does submit to the authority of the Constitution of the United States and the Article III judiciary. Missing from L'Abbe's argument is the fact that state governments existed before the creation of the national government, are repeatedly referred to in the U.S. Constitution, and their power and capability are continuously referred to in federal court opinions. As the Federalist Papers reveal, a chief concern for the people of the thirteen states was distribution of authority between the states' governments and the proposed federal government if they adopted the proposed U.S. Constitution.

In Federalist Paper No. 45, James Madison provided examples of past nations that failed for want of a powerful, centralized government. He also softened the concerns for potential lost state power by writing, "[T]he states will retain, under the proposed Constitution, a very extensive portion of active *sovereignty* . . . ." THE FEDERALIST NO. 45 (James Madison) (emphasis added). This concern also included the degree of retained state sovereignty in conjunction with the federal government, to which Madison wrote, "The States governments may be regarded as constituent and essential parts of the federal government; whilst the latter is nowise essential to the operation or organization of the former." *Id*. After stating the national government was not essential to the operation or organization of the states, he illustrated why:

> The powers delegated by the proposed Constitution to the federal government, are few and defined. Those which are to remain in the State governments are numerous and indefinite. . . . *The powers reserved to the several States will extend to all the objects which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people, and the internal order, improvement, and prosperity of the State.*

*Id*. (emphasis added). In a later paper, Alexander Hamilton described the envisioned "few and defined" powers delegated to the federal judiciary:

> [T]he judiciary authority of the Union ought to extend to these several descriptions of cases: 1st, to all those which arise out of the laws of the United States, passed in pursuance of their just and constitutional powers of legislation; 2d, to all those which concern the execution of the provisions expressly contained in the articles of Union; 3d, to all those in which the United States are a party;

3

4th, to all those which involve the PEACE of the CONFEDERACY, whether they relate to the intercourse between the United States and foreign nations, or to that between the States themselves; 5th, to all those which originate on the high seas, and are of admiralty or maritime jurisdiction; and, lastly, to all those in which the State tribunals cannot be supposed to be impartial and unbiased.[2]

THE FEDERALIST NO. 80 (Alexander Hamilton).

Having explained the limitation of the federal judiciary's jurisdiction, Hamilton reiterated Madison's claim that the state government's retained powers were "numerous and indefinite." "I shall lay it down as a rule, that the State courts will RETAIN the jurisdiction they now have, unless it appears to be taken away in one of the [few and defined] enumerated modes." THE FEDERALIST NO. 82 (Alexander Hamilton). Hamilton later restated this point by writing:

I hold that the State courts will be divested of no part of their primitive jurisdiction . . . and I am even of opinion that in every case in which they were not expressly excluded by the future acts of the national legislature, they will of course take cognizance of the causes to which those acts may give birth.

*Id*.

Although the Federalist Papers are not law or persuasive authority, they reveal insight to the concerns and ideas present at the creation and formation of the federal government and the U.S. Constitution. The Federalist Papers indicate that prior to the adoption of the U.S. Constitution, state governments were recognized to have sovereign authority over their jurisdictions, which included making and enforcing state laws. The Federalist Papers also signify the concern over any sovereignty the states would be required to relinquish if the U.S. Constitution was adopted. As both Madison and Hamilton detailed, the federal government's powers were "few and defined" and the state government's powers were "numerous and indefinite."

## B.     United States Constitutional References to States' Powers

The U.S. Constitution was written to establish and govern the national government, not to abolish the state governments. This notion is exemplified by the U.S. Constitution's references to each of the three bodies of state governments: the state executive is referenced in Article I, Section 2, Clause 4 and Article I, Section 3, Clause 2; the state legislature in Article I, Section 3, Clause 1 and Article I, Section 3, Clause 2; and the state judiciary in Article IV, Section 1,

---

2       The last example refers to a case concerning citizens from differing states.

Clause 1.[3]  Aside from the express and implied powers of the national government, the U.S. Constitution also restricts the power of the states in a limited manner.[4]  (*See* U.S. CONST. art. I, § 9, cl. 5; art. I, § 9, cl. 6; art. I, § 10, cl. 1; art. I, § 10, cl. 2; art. I, § 10, cl. 3.)  The remaining powers are left to the states or the people.

The Tenth Amendment to the U.S. Constitution describes the reserved state powers. "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  U.S. CONST. amend. X.  This reservation of states' powers was reiterated by the Supreme Court:

> The Tenth Amendment likewise restrains the power of Congress, but this limit is not derived from the text of the Tenth Amendment itself, which, as we have discussed, is essentially a tautology.  Instead, the Tenth Amendment confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States.

*New York v. United States*, 505 U.S. 144, 156-57 (1992).

Thus, the U.S. Constitution has relatively little to say about the states' powers.  This is because the document was intended for the creation and governance of the national government. Still, it shows clear intent to reserve powers for the states.  The powers reserved to the states are those that are not necessary for the administration of the newly formed national government.

## C.  Creation of the State of Idaho and Its Authority

It is clear from the documents available at the time of the U.S. Constitution's proposal that the thirteen then-existing states would take part in the U.S. Constitution's adoption process. These states, and their sovereignty, would both benefit and suffer from the protections and restrictions of the U.S. Constitution.  The creation of additional states was addressed by the U.S. Constitution's provision controlling the admittance of new states to the Union.  The newly admitted states were guaranteed equal footing with other states upon admission.  *See, e.g.*, U.S. CONST. art. IV, § 3, cl. 1; art. IV, § 3, cl. 2; *Utah Div. of State Lands v. United States*, 482 U.S. 193 (1987); *Skiriotes v. Florida*, 313 U.S. 69, 77 (1941).

Article IV, Section 3, Clause 1 of the U.S. Constitution grants Congress the ability to admit new states into the Union, but not to form states.  The "equal footing" requirement means

---

[3]     The examples in this list were limited for brevity.

[4]     The implied powers are only those that are necessary and proper to carry out the requirements of the U.S. Constitution.  U.S. CONST. art. I, § 8, cl. 18.

Congress cannot admit an entity that is considered less than a currently existing state. *Skiriotes*, 313 U.S. at 77. For a state to be admitted, it must already exist as a separate political body and possess a constitution. *See*, ACT FOR ADMISSION OF WEST VIRGINIA INTO UNION, 10 Op. Att'y Gen. 427 (1862). Therefore, the people using the powers reserved to the states or the people via the Tenth Amendment, must pass a constitution before Congress can vote on admitting a new state to the Union. *See generally, Coyle v. Smith*, 221 U.S. 559, 568-570 (1911); *Conway v. United States*, 1 Ct. Cl. 68 (1863).

In 1889, the people of the Territory of Idaho held a constitutional convention. *See* Idaho Admission Bill, ch. 656, 26 Stat. 215 (1890). Later in the same year, the people of the territory voted to adopt the proposed constitution. *Id*. The Constitution of the State of Idaho was approved on July 3, 1890, when President Benjamin Harrison signed the Idaho Admission Bill, admitting Idaho into the Union. *Id*.

The Idaho Constitution, which was created and voted on by the people of the Territory of Idaho and approved by President Harrison, creates departments of government. IDAHO CONST. art. II, § 1. The Idaho Constitution also distributes the state's powers of those departments that it creates. Article III, section 1, of the Idaho Constitution provides, "The legislative power of the state shall be vested in a senate and house of representatives." Additionally, article V, section 2 of the Idaho Constitution provides in part:

> The judicial power of the state shall be vested in a court for the trial of impeachments, a Supreme Court, district courts, and such other courts inferior to the Supreme Court as established by the legislature. . . . The jurisdiction of such inferior courts shall be as prescribed by the legislature.

Thus, the creation and the authority the State of Idaho has, is derived from both the people of the state and the national government. The people had to vote on and establish a state constitution before the national government would admit Idaho into the Union. The national government had to admit Idaho into the Union before Idaho could be guaranteed "equal footing" with currently existing states. Due to the equal footing requirement, Idaho has the same state powers and restrictions as the original thirteen states that adopted the U.S. Constitution.

## ANALYSIS

**A.      The Magistrate Court Had Both Subject Matter and Personal Jurisdiction**

L'Abbe primarily argues that the district court, acting in its intermediate appellate capacity, erred by finding that the magistrate court had subject matter and personal jurisdiction to enter judgment in L'Abbe's case.[5]  Whether a court lacks jurisdiction is a question of law, over which this Court exercises free review. *State v. Jones*, 140 Idaho 755, 757, 101 P.3d 699, 701 (2004).  To properly proceed in a criminal case, a court must acquire both personal and subject matter jurisdiction. *State v. Rogers*, 140 Idaho 223, 228, 91 P.3d 1127, 1132 (2004).  Personal jurisdiction refers to a court's power to bring a person into its adjudicative process, whereas subject matter jurisdiction refers to jurisdiction over the nature of the case and the type of relief sought. *State v. Ambro*, 142 Idaho 77, 79, 123 P.3d 710, 712 (Ct. App. 2005).  Thus, without personal jurisdiction, the court has no person to hold accountable; without subject matter jurisdiction, the court has no alleged crime to hold the person accountable for. *Rogers*, 140 Idaho at 228, 91 P.3d at 1132.

L'Abbe asserts the magistrate court lacked subject matter jurisdiction to try him because the magistrate court is not an Article III court under the U.S. Constitution.[6]  However, as we addressed above, state governments are not created by the U.S. Constitution.  Article V, section 2 of the Idaho Constitution delegates the state's judicial powers to the state's courts and delegates the power to prescribe the inferior courts' jurisdiction to the legislature.  This provision of the Idaho Constitution was intended to make the legislature the sole authority in determining the jurisdiction of inferior courts. *Acker v. Mader*, 94 Idaho 94, 96, 481 P.2d 605, 607 (1971).  In accordance with article V, section 2 of the Idaho Constitution, the legislature enacted Idaho Code § 1-2201, establishing in each county of the state of Idaho a magistrate division of the district court.  Subject to the rules promulgated by the Idaho Supreme Court, the legislature also assigned to the magistrate division those proceedings arising under the Idaho Traffic Infractions Act.  I.C. § 1-2208; *see also* Idaho Infraction Rule 4 ("Every magistrate in the state of Idaho is

---

[5]      L'Abbe's brief generally challenges both the magistrate and district court's decisions. This Court will address these issues on appeal under our *Pelayo* standard of review above.

[6]      L'Abbe's Seventh Amendment issue is addressed under subsection B.

hereby assigned and granted the authority and jurisdiction to hear, process and determine . . . any citable offense alleged to have occurred within the state of Idaho.") Thus, the magistrate court had subject matter jurisdiction to try L'Abbe's speeding violation infraction.

L'Abbe also asserts that the magistrate court did not have personal jurisdiction over him because he only made a special appearance to challenge the magistrate's jurisdiction in this case. The State of Idaho has personal jurisdiction over any person who commits all or part of a crime within its territory. I.C. § 18-202; *see also Rogers*, 140 Idaho at 228, 91 P.3d at 1132. The Supreme Court of Idaho has held that a traffic infraction is criminal in nature. *State v. George*, 127 Idaho 693, 699, 905 P.2d 626, 632 (1995); *see also* IDAHO CONST. art. V, § 1 ("[E]very action prosecuted by the people of the state as a party, against a person charged with a public offense, for the punishment of the same, shall be termed a criminal action."). In a criminal case, an Idaho court acquires personal jurisdiction over the defendant after his or her first appearance in that case. *Rogers*, 140 Idaho at 228, 91 P.3d at 1132.[7]

Aside from L'Abbe's alleged special appearance, which is of no significance, he does not challenge the claim that he made an appearance in this case at the pretrial conference.[8] Thus, the magistrate court acquired personal jurisdiction over L'Abbe when he appeared at the pretrial conference for the traffic infraction committed within this state.

**B.     No Right to a Seventh Amendment Jury Trial for an Infraction Citation**

L'Abbe argues that the district court, acting in its intermediate appellate capacity, erred by finding that the magistrate correctly denied L'Abbe a Seventh Amendment jury trial to determine if L'Abbe committed a traffic violation. The Seventh Amendment to the U.S. Constitution refers to common law suits in federal court, to which a jury trial is guaranteed if the value in controversy exceeds twenty dollars.

The U.S. Supreme Court has held that a Seventh Amendment right to a jury trial in a civil case is not incorporated by the Fourteenth Amendment and is not applicable to the states.

---

[7]     Additionally, this Court has "consistently and unequivocally rejected the notion that a state must contract with a citizen either to obtain personal jurisdiction or to subject the citizen to its laws." *State v. Simmons*, 115 Idaho 877, 878, 771 P.2d 541, 542 (Ct. App. 1989).

[8]     L'Abbe's reference to a special appearance is misplaced. Idaho Rule of Civil Procedure 4(i)(2) allows for a special appearance to contest personal jurisdiction. However, no similar rule exists in criminal law.

*Minneapolis & St. Louis R.R. Co. v. Bombolis*, 241 U.S. 211, 216-17 (1916). Because of the holding in *Bombolis*, and the Supreme Court's subsequent holdings on the issue, L'Abbe has no constitutional right to a Seventh Amendment jury trial in state court.

Additionally, the Idaho legislature has denied the right to a jury trial for traffic infractions. I.C. § 49-1502(1) ("The procedure for processing an infraction citation and the trial thereon, if any, shall be the same as provided for the processing of a misdemeanor citation under rules promulgated by the supreme court, *except there shall be no right to a trial by jury*." (emphasis added)). As a result, L'Abbe had no right to either a federal or state jury trial.

## C.      Other Claims

L'Abbe concedes that the definitive issue is jurisdiction. However, he presents several nonjurisdictional arguments on appeal. L'Abbe previously used similar arguments in an attempt to overturn two prior convictions, which this Court affirmed in unpublished opinions. *See State v. L'Abbe*, Docket No. 40833 (Ct. App. Nov. 25, 2013); *State v. L'Abbe*, Docket No. 39376 (Ct. App. Sept. 4, 2012). Upon review of the record, we conclude that L'Abbe's nonjurisdictional arguments are without merit. In addition, L'Abbe fails to support his arguments with citations to relevant authority, as the authority he cites is inapplicable or irrelevant. As a result, L'Abbe's nonjurisdictional arguments are meritless.

## V.
## CONCLUSION

We conclude that the district court correctly found the magistrate court had both subject matter and personal jurisdiction over this case and L'Abbe. Also, the district court correctly found that the magistrate properly denied L'Abbe's request for a Seventh Amendment jury trial. L'Abbe's remaining claims are without merit. The district court's intermediate appellate decision upholding L'Abbe's judgment of conviction for speeding is affirmed.

Judge LANSING and Judge MELANSON **CONCUR.**